# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

SANDRA KELLY, JANICE WALTMAN,
AND SYLVIA PATINO, INDIVIDUALLY
& ON BEHALF OF OTHERS SIMILARLY SITUATED,

<div style="margin-left:2em">Plaintiffs</div>

vs.                                                    Case No 2:13-cv-00441-JRG

HEALTHCARE SERVICES GROUP, INC.,

<div style="margin-left:2em">Defendant</div>

---

## DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION
## FOR SUMMARY JUDGMENT
## ON DEFENDANT'S AFFIRMATIVE DEFENSES

---

# TABLE OF CONTENTS

**Page**

I.      RESPONSE TO PLAINTIFFS' STATEMENT OF THE ISSUES ..................................... 1

II.     RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................................................................................................ 2

III.    INTRODUCTION ............................................................................................................. 8

IV.     ARGUMENT ..................................................................................................................... 9

    A.   Plaintiffs Ignore The Summary Judgment Standard In A Collective Action ............................................................................................................................. 9

    B.   Genuine Issues Of Material Fact Exist Regarding Whether Salaried AMs Were Properly Classified As Exempt. .................................................................. 10

        1.   There Are Genuine Disputes Of Material Fact Concerning The Amount Of Time AMS Spend Performing Exempt And Nonexempt Work. .................................................................................... 12

        2.   There Are Genuine Issues Of Material Fact Regarding The Relative Importance Of AMs' Exempt And Nonexempt Work. ............... 17

        3.   Genuine Issues Of Material Fact Exist Regarding Whether Plaintiffs Had Relative Freedom From Direct Supervision. ...................... 20

        4.   Genuine Disputes Of Material Fact Exist Regarding The Relationship Between Plaintiffs' Salaries And The Wages Paid Other Employees. ................................................................................... 24

    C.   HSG Has Submitted Substantial Evidence That It Acted In Good Faith. ............. 26

    D.   Plaintiffs' Motion For Summary Judgment On HSG's "*De Minimis*" Affirmative Defense Is Premature. ....................................................................... 28

V.      CONCLUSION ................................................................................................................ 29

i

## TABLE OF AUTHORITIES

CASES

*Alberton v. Commonwealth Land Title Inc. Co.*,
  299 F.R.D. 109 (E.D.Pa. 2014)................................................................................................10

*Amash v. Home Depot USA, Inc.*,
  24 F. Supp. 3d 214, 222 (N.D.N.Y. 2014)................................................................................24

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986).............................................................................................................9, 17

*Belle v. University of Pittsburgh Medical Center*,
  2014 WL 4828899 (W.D. Pa., Sept. 29, 2014)..........................................................................9

*Chambers v. Sears Roebuck and Co.*,
  428 F. App'x 400 (5th Cir. 2011) .............................................................................................29

*Cooper Tire & Rubber Co. v. Farese*,
  423 F.3d 446 (5th Cir.2005) ......................................................................................................9

*Dalheim v. KDFW-TV*,
  918 F.2d 1220 (5th Cir. 1990) ............................................................................................12, 17

*Fontenot v. Upjohn Co.*,
  780 F.2d 1190 (5th Cir. 1986) ....................................................................................................8

*Grace v. Family Dollar Stores, Inc.*,
  637 F.3d 508 (4th Cir. 2011) ....................................................................................................15

*Hunter v. Sprint Corp.*,
  453 F. Supp. 2d 44 (D.D.C. 2006).............................................................................................26

*Jones v. Dolgencorp, Inc.*,
  789 F. Supp. 2d 1090 (N.D. Iowa 2011)..........................................................................24, 25, 26

*Killion v. KeHE Distributors, LLC*,
  761 F.3d 574 (6th Cir. 2014) ......................................................................................................9

*Lovelady v. Allsup's Convenience Stores, Inc.*,
  304 F. App'x 301 (5th Cir. 2008) ..............................................................................................12

*McFeeley v. Jackson Street Entertainment, LLC*,
  47 F.Supp.3d 260, 278 (D. Md. 2014).......................................................................................26

*Mims v. Starbucks Corp.*,
  2007 WL 10369 (S.D. Tex. Jan. 2, 2007)...................................................................19, 20, 23

i

*Moore v. Tractor Supply Co.,*
    352 F.Supp.2d 1268 (S.D. Fla. 2004) ..................................................24

*Morgan v. Family Dollar Stores, Inc.,*
    551 F.3d 1233 (11th Cir. 2008) .............................................9, 10, 25, 26

*Myrick v. Dolgencorp, LLC,*
    2010 WL 146874 (M.D. Ga., Jan. 11, 2010) ...........................................25

*Plaintiffs Ignore The Summary Judgment Standard In*
    *A Collective Action* ......................................................................9

*Smith v. City of Jackson, Miss.,*
    954 F.2d 296 (5th Cir. 1992) ..............................................................12

*Thomas v. Speedway SuperAmerica, LLC,*
    506 F.3d 496 (6th Cir.2007) .......................................................17, 22, 23

*Tolan v. Cotton,*
    134 S.Ct. 1861 (2014) (per curiam) .......................................................1

*Von Friewalde v. Boeing Aerospace Operations, Inc.,*
    339 Fed.Appx. 448 (Aug. 4, 2009) .........................................................8

## STATUTES, RULES & REGULATIONS

29 C.F.R. § 541.100 .........................................................................10, 13

29 C.F.R. § 541.102 ..............................................................................11

29 C.F.R. § 541.106 .........................................................................13, 14

29 C.F.R. § 541.700(a) ...........................................................................11

29 C.F.R. § 541.700(b) ...........................................................................12

29 CFR § 541.100(a)(2) ..........................................................................15

29 U.S.C. § 260 ............................................................................26, 27, 28

*Fair Labor Standards Act* ..........................................................................2

Fair Labor Standards Act of 1938 ................................................................26

FLSA ...........................................................................8, 9, 10, 15, 26, 27

Rule 11 ..............................................................................................9

SL1 1362992v3 104212.00240

Defendant, Healthcare Services Group, Inc. ("HSG"), files this Response to Plaintiffs' Motion for Summary Judgment on Defendant's Affirmative Defenses.

## I. RESPONSE TO PLAINTIFFS' STATEMENT OF THE ISSUES

Plaintiffs' "Statement of the Issues" is highly misleading and inaccurate. The question before this Court is not, for example, "[w]hether Plaintiffs' primary duty is management of an enterprise or a customarily recognized department or subdivision thereof."[1] This essentially asks the Court to weigh the evidence and make a finding of fact, a request that is contrary to the "fundamental principle" of summary judgment.[2] The proper question is whether, after making all reasonable inferences in favor of HSG, there is a disputed material fact from which a reasonable jury could conclude that Plaintiffs' primary duty is management. If so, even as to a single Plaintiff, the motion must be denied. All of Plaintiffs' purported Statements of the Issues suffer the same defect. HSG therefore sets forth the following counter-Statements that reflect the proper summary judgment standard:

1. Whether Plaintiffs have shown that there is no genuine dispute as to a material fact as to whether AMs' primary duty is management of an enterprise or a customarily recognized department or subdivision thereof as to each member of the Salaried AM Class;

2. Whether Plaintiffs have shown that there is no genuine dispute as to a material fact as to whether they customarily and regularly direct the work of two or more other employees, as to each and every member of the Salaried AM Class;

3. Whether Plaintiffs have shown that there is no genuine dispute as to a material fact as to whether the AMs' primary duty is the performance of office or non-manual work directly related to the management or general business operations of HSG or its customers, as to each and every member of the Salaried AM Class;

4. Whether Plaintiffs have shown that there is no genuine dispute as to a material fact as to whether AMs exercise discretion and independent judgment with respect to matters of significance, as to each and every member of the Salaried AM Class;

---

[1] (Pltf's Mot. at p. 2).
[2] *Tolan v. Cotton*, 134 S.Ct. 1861, 1862 (2014) (per curiam).

SL1 1362992v3 104212.00240

5. Whether Plaintiffs have shown that there is no genuine dispute as to a material fact as to whether HSG acted in good faith and had reasonable grounds to believe that its actions complied with the Fair Labor Standards Act, as to each and every member of the Salaried AM Class;

6. Whether Plaintiffs have shown that there is no genuine dispute as to a material fact as to whether the offset, accord and satisfaction, payment, and release affirmative defenses may apply as to any member of the Salaried AM Class;

7. Whether Plaintiffs have shown that there is no genuine dispute as to a material fact regarding the de minimis defense as to each member of the Salaried AM Class.

## II. RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS

1. Disputed.[3]

5. HSG denies that labor and supply budgets are created solely to meet HSG's financial objectives.[4]

6. Disputed.[5]

7. Disputed to the extent that Paragraph 7 contends that there is an alleged company-wide practice.[6]

8. Disputed to the extent that Paragraph 8 contends that there is an alleged company-wide policy regarding a DM's primary job.[7]

9. Disputed.[8]

10. Disputed.[9]

---

[3] To the contrary, HSG provides expert housekeeping and dietary management services in health care facilities with which it contracts throughout the country. (*See, e.g.,* J. Salamone Decl. at ¶ 3; M. Montalvo Decl. at ¶ 3; N. Gonzalez Decl. at ¶ 3).

[4] (Kelly Dep. at 46:13-15).

[5] To the contrary, the testimony Plaintiffs cite states that regions and divisions analyze the system for "accurate budgeting." (Kelly Dep. at 46:15-17).

[6] The testimony Plaintiffs cite is that of a single manager who explained the way he runs things in his particular area. (Kelly Dep. at 47:7-19).

[7] The exhibit Plaintiffs cite specifically refers to "Region HL/HQ" and is dated December 9, 2009, which is before the time period at issue in this lawsuit. (Ex. 4 to Plaintiffs' Motion for Summary Judgment.

[8] Plaintiffs cite only a portion of Kelly's testimony, omitting his testimony that "we don't cap overtime at all," which contradicts Plaintiffs' Statement of Undisputed Material Fact ("SUMF") No. 9. Plaintiffs also cite Ex. 8, which is an email from a DM in response to an AM who reported that *the AM had authorized an hourly employee to work overtime.* The DM merely said "Call me before you do that from now on." Exhibit 10 is an email from an RM to a DM regarding a *temporary* cap on overtime. There are many examples in the record of overtime worked by hourly employees. *See, e.g.,* Dominguez Dep. at 64:24 – 65:2, 94:24 – 95:4, 96:20; Cleveland Dep. at 108:2-13, 111:22-25, 125:16-19. Indeed, if there were a blanket prohibition on overtime, as Plaintiffs allege in SUMF No. 9, the individual emails Plaintiffs cite would be unnecessary.

2

11. Disputed.[10]

14. Disputed.[11]

15. Disputed.[12]

16. Disputed.[13]

18. Disputed.[14]

20. Disputed.[15]

21. Disputed.[16]

22. Disputed.[17]

---

[9] Exhibit 11, which Plaintiffs cite, is an email from a client complaining that hours were cut and, as a result, *work did not get done*. This contradicts Plaintiffs' assertion that AMs are required to "complete the remaining work." Exhibit 59 is testimony from a plaintiff who testified that he and the other AMs in his District received a text message from a DM asking them to collectively cut 40 hours from the district's payroll during a particular pay period. The AM testified that *this was the only time he had received such a request*. (Ex. 59 to Plaintiffs' Motion at 260:4 – 261:12). None of the other exhibits Plaintiffs cite suggest that AMs are required to do work not completed by hourly employees.

[10] HSG disputes the claim that AMs are not eligible for bonuses. (Hurlock Dep. at 89:19 – 90:4) (Kelly Dep. at 148:21-25, 149:1-22). HSG also disputes that managers are disciplined every time the unit(s) for which they are responsible exceed(s) a budget. (Hurlock Dep. at 101:19-21). Hurlock testified that discipline would occur only if exceeding the budget is "a systemic problem." (Hurlock Dep. at 101:24).

[11] HSG disputes that a "master employee schedule" outlines all work that the hourly employees will work on a given day. While an employee schedule outlines what work should be done by hourly employees in a day, it is subject to change on a given day at the AM's discretion based on his or her assessment of the departments and/or facility's needs. (Clark Dep. at 66:6-14; Cleveland Dep. at 82:13-25, 83:23, 106:4-21, 113:1-7, 133:5-15; Heard Dep. at 15:9-14, 69:1-6, 114:10 – 115:25).

[12] AMs frequently create and alter employee schedules. (Clark Dep. at 66:6-14; Cleveland Dep. at 82:13-25, 83:23, 106:4-21, 113:1-7, 133:5-15; Heard Dep. at 15:9-14, 69:1-6, 114:10 – 115:25; S. Johnson resume at 1; J. J. Layne resume at 1; J. Stewart resume at 1; J. Barger resume at 1; M. Benford resume at 1; J. Salamone Decl. at ¶¶ 6, 8; I. McLean resume at 1; M. Huckaby resume at 1; J. Stevens resume at 1; S. Gash resume at 1; A. Dominguez resume at 1; A. Griffin resume at 1; L. Harris resume at 1; M. Montalvo Decl. at ¶¶ 6, 8; N. Gonzalez Decl. at ¶¶ 6, 8-9; Jones Decl. at ¶¶ 6-8; Hernandez Decl. at ¶¶ 6-7; B. Roeder Decl. at ¶ 7).

[13] (Hurlock Dep. at 89:19 – 90:4) ("We may incentivize an account manager that is involved in the sales process."). *See also* Clark Dep. at 136:12-23 ("[T]hey wanted us to pretty much be a salesman, also."). Plaintiffs cite Hurlock's and Hackman's testimony for the proposition that AMs may and do bind the company in a contract. This is a blatant misrepresentation of the record, as neither of the excerpts Plaintiffs cite contains a discussion regarding AMs' ability to contract on behalf of HSG. Rather, they were discussing DMs' duties and stated that DMs have the ability to contract with new clients. (Ex. 51 to Plaintiffs' Motion at 40:3-16; Ex. 54 to Plaintiffs' Motion at 178:11 – 179:3) To the extent Plaintiffs ask the Court to infer that a DMs' ability to do so is mutually exclusive, there is nothing to support the inference, especially where inferences must be made in HSG's favor.

[14] (Clark Dep. at 129:24 – 130:12; Hackman Dep. at 116:16 – 119:4).

[15] Ex. 48 to Plaintiffs' Motion at 3 *expressly states that AMs may change a job routine with the DM's approval*, thus contradicting Plaintiffs' SUMF No. 20. There is evidence that AMs do create and alter job routines. (S. Smith resume at 2; Hurlock Dep. at 130:16 (AMs prepare job routines); Clark Dep. at 129:24 – 130:12).

[16] To the contrary, job routines are tailored to each facility and are revised and altered by AMs. (Hurlock Dep. at 130:16, 131:1-22; Clark Dep. at 129:24 – 130:12).

24. Disputed.[18]

25. Disputed.[19]

26. Disputed.[20]

27. Disputed.[21]

28. Disputed.[22]

29. Disputed to the extent that Paragraph 29 refers to vacation, holiday and sick requests for hourly employees.[23]

30. Disputed.[24]

31. Disputed.[25]

---

[17] The cited exhibit states only that AMs must insist that all hourly employee job routines are completed each day.

[18] The purpose of payroll confirmation sheets is to report to DMs how well the AM managed payroll during a pay period. (U. Hunt Dep. at 131:20-25; Trevino Dep. at 60:18 – 61:7; Cleveland Dep. at 108:24 – 110:112:14; Dominguez Dep. at 94:5-18; Heard Dep. at 185:19 – 186:18).

[19] Ex. 70 to Plaintiffs' Motion is a deposition transcript from one of the plaintiffs describing his own perception rather than a statement by the company. Ex. 18 is an email from a RM in an unspecified region which appears to discuss a manager who has problems with "professionalism" and documentation, and suggesting that the manager be *replaced* with a "glorified housekeeper." Ex. 143 is notes from a focus group that led to HSG's expert report and appears to represent an AM's report of his or her perception of his or her job, rather than the Company's perception of the AM position. There also is no indication as to whether any of the citations refer to salaried AMs or hourly AMs who are not part of this class. The remaining exhibits Plaintiffs cite make no reference whatsoever to the quoted language in Plaintiffs SUMF No. 25.

[20] HSG admits that it classifies AMs as either salaried or hourly and disputes that the classification is not based on the AM's individual job duties. (Hurlock Dep. at 87:13-15, 97:4-6; HCSG 00073).

[21] Plaintiffs cite three emails that simply cannot be construed as supporting Plaintiffs' SUMF No. 27. Plaintiffs' Ex. 23 is an indecipherable email, Plaintiffs' Ex. 24 appears to be an email from an RM regarding his tentative thoughts on possible changes to a facility, and Plaintiffs' Ex. 25 is an RM's response to an Administrator's email regarding staffing patterns in his facility. To the extent Plaintiffs contend that any of the emails refers to an AM, there is no indication as to whether such email refers to a salaried or hourly AM.

[22] To the contrary, the AM typically decides whether and when to perform manual labor as part of his or her management duties. (Clark Dep. at 72:9-14, 94:1-11; Cleveland Dep. at 151:11-16, 160:25 – 161:3; Dominguez Dep. at 131:22 – 132:4; Jamison Dep. 183:4-23).

[23] (Heard Dep. at 75:20-22; U. Hunt Dep. at 144:15-20; Jamison Dep. at 106:22-24; Clark Dep. at 66:25 – 67:15). Moreover, Plaintiffs' SUMF No. 29 is directly contradicted by Plaintiffs' SUMF No. 65, which alleges that "DMs must properly plan and schedule all vacation holiday, and sick time."

[24] (Hackman Dep. at 57:21 – 59:16, 141:7 – 142:13; Clark Dep. at 96:25 – 99:20; Dominguez Dep. at 106:1-11, 107:6-22; Jamison Dep. at 84:10 – 85:1; Kelly Dep. at 91:20-23, 92:12, 238:5-6; Heard Dep. at 137:11 – 138:8; R. Stephens Dep. at 76:13 – 78:14; Beegle Dep. at 61:24 – 62:18; Hardee Dep. at 114:9-21; McNeely Dep. at 193:11 – 195:1; Dec. 2014 Banks Report at ¶ 8; Hackman Dep. at 205:17 – 206:8; U. Hunt Dep. at 131:20-25; Trevino Dep. at 60:18 – 61:7; Cleveland Dep. at 108:24 – 112:14; Heard Dep. at 185:19 – 186:18; I. McLean resume at 1; J. Kirk resume at 1; S. Kreck resume at 1; L. Harris resume at 1; J. Baez resume at 3; V. Stewart resume at 1; S. Smith resume at 2; A. Dominguez resume at 1; S. Gash resume at 1; A. Griffin resume at 1; J. Salamone Decl. at ¶¶ 6-7; M. Montalvo Decl. at ¶¶ 6-7; N. Gonzalez Decl. at ¶¶ 6-7, 9; J. Layne resume at 1; Jones Decl. at ¶¶ 6-7; Hernandez Decl. at ¶¶ 6, 8; M. Lawrence Decl. at ¶ 8).

[25] The only thing Plaintiffs cite in support of this assertion is testimony from a Plaintiff who testified that, when he was a DM, he did not trust AMs with anything with a financial impact. (Ex. 54 to Plaintiffs' Motion).

32. Disputed.[26]

33. Disputed.[27]

34. Disputed.[28]

35. Disputed.[29]

36. Disputed.[30]

37. Disputed.[31]

38. Disputed.[32]

39. Disputed.[33]

40. Disputed [34]

41. Disputed.[35]

42. Disputed.[36]

---

Contrary to Plaintiffs' SUMF No. 31, as John Kelly testified, AMs are responsible for managing a contract with HSG's client that is worth up to half a million dollars. (Kelly Dep. at 235:13 – 236:12). There is substantial evidence in the record that AMs are involved in things that have a financial impact. (J. Layne resume at 1 ("Responsible for marketing and merchandising inside and outside of the facility."; Clark Dep. at 96:25 – 99:20; Dominguez Dep. at 106:1-11, 107:6-22; Jamison Dep. at 84:10 – 85:1; Kelly Dep. at 91:20-23, 92:12, 238:5-6; Heard Dep. at 137:11 – 138:8; R. Stephens Dep. at 76:13 – 78:14; Beegle Dep. at 61:24 – 62:18; Hardee Dep. at 114:9-21; McNeely Dep. at 193:11 – 195:1; Dec. 2014 Banks Report at ¶ 8).

[26] ([Dkt. 235, Exs. 1-39; Dec. 2014 Banks Report at ¶ 4 ("[T]he vast majority of Account Managers in this study spent more than 50% of their time performing exempt work.").

[27] Plaintiffs cite only a single email that does not specify whether it refers to hourly or salaried account managers and is limited to a particular district or region and testimony of plaintiffs concerning their own experience.

[28] Plaintiffs misrepresent the job description. It states that an AM must have the *ability* to perform those functions. (Ex. 52 to Plaintiffs' Motion at 1). As HSG's Director of Human Resources testified, the job description lists all possible physical tasks that an AM could be called on to perform as necessary. (Fissinger Decl. at ¶ 4).

[29] AMs are not *required* to do so. If they do so it is because that is how they have chosen to manage their department (Clark Dep. at 72: 9-14, 94:1-11; Dominguez Dep. at 131:22 – 132:4; Cleveland Dep. at 160:25 – 161:3; Jamison Dep. at 183:4-23).

[30] Plaintiffs have cited no evidence to support the assertion that all AMs are required to do this on a class-wide basis.

[31] (J. Baez Dep. at 86:18 – 87:20; Griffin Dep. at 64:12 – 65:12).

[32] (Griffin Dep. at 64:12 – 65:12).

[33] (Jackson Decl. at ¶ 16; Kelly Dep. at 116:2 – 117:7; J. Salamone Decl. at ¶ 16). Even when they do perform manual work, AMs continue to manage the facility while doing so. (Clark Dep. at 60:1-14, 93:5-14, 103:2-6; Cleveland Dep. at 100:11-14, 101:2-11; Barger Dep. at 231:1-17; Beegle Dep. at 58:8-59:24; Hackman, 130:22-131:7; Lopez Dep. at 138:2-23; Hilburn Dep. at 63:17 – 65:13; Dec. 2014 Banks Report at ¶ 6).

[34] Plaintiffs have identified isolated emails in which managers reference AMs being part of a schedule, and there is no information regarding whether the emails refer to hourly or salaried AMs. Plaintiffs do not cite a "policy."

[35] (Rivera Dep. at 243:23 – 244:14; Stephens Dep. at 47:5 – 51:5; Newell Decl. at ¶ 13; J. Salamone Decl. at ¶¶ 6, 12; M. Montalvo Decl. at ¶¶ 6, 13; N. Gonzalez Decl. at ¶¶ 6, 12; Jones Decl. at ¶¶ 6, 13; M. Lawrence Decl. at ¶ 13; Hernandez Decl. at ¶ 13; J. Hunt Decl. at ¶¶ 6, 12; B. Roeder Decl. at ¶ 13).

5

43. Disputed.[37]

44. Disputed.[38]

45. Disputed.[39]

46. Disputed.[40]

47. Disputed.[41]

48. Disputed.[42]

49. Disputed [43]

50. Disputed to the extent that SUMF No. 50 suggests that AMs did not do these tasks.[44]

51. Disputed to the extent that SUMF No. 51 suggests that AMs did not do these tasks.[45]

52. Disputed to the extent that SUMF No. 52 suggests that AMs did not do these tasks.[46]

53. Disputed to the extent that SUMF No. 50 suggests that AMs did not do these tasks.[47]

---

[36] (Hackman Dep. at 57:21 – 59:16, 141:7 – 142:13; Clark Dep. at 96:25 – 99:20; Dominguez Dep. at 106:1-11, 107:6-22; Jamison Dep. at 84:10 – 85:1; Kelly Dep. at 91:20-23, 92:12, 238:5-6; Heard Dep. at 137:11 – 138:8; R. Stephens Dep. at 76:13 – 78:14; Beegle Dep. at 61:24 – 62:18; Hardee Dep. at 114:9-21; McNeely Dep. at 193:11 – 195:1; Dec. 2014 Banks Report at ¶ 8).

[37] (Faggard Decl. at ¶ 14; Heard Dep. at 123:5 -124:18).

[38] (Dominguez Dep. at 134:1-16; Trevino Dep. at 98:13-21; Barger Dep. at 46:14 – 47:5; Underwood Dep. at 192:22 – 197:1; Fox Dep. at 63:14-25; Bowers Dep. at 28:10 – 29:8;  76:22-24; Rochon Dep. at 68:1-18, Phebus Dep. at 53:13 – 54:15; 108:20 – 109:2; Corbin Dep. at 95:2-14; Rivera Dep. at 105:5-16; Young Dep. at 27:16 – 28:9; Moore Dep. at 41:14-19; Waltman Dep. at 84:20 – 85:16) Wajer Dep. at 68:7-12, 148:3 – 152:1).

[39] (Hilburn Dep. at 51:24 – 52:1).

[40] (Brooks Dep. at 180:1 – 181:8; V. Stewart Dep. at 141:2-25).

[41] (Clark Dep. at 60:1-14, 93:5-14, 103:2-6; Cleveland Dep. at 100:11-14, 101:2-11; Barger Dep. at 231:1-17; Beegle Dep. at 58:8 – 59:24; Hilburn Dep. at 63:17 – 65:13).

[42] (Kozenchik Decl. at ¶ 20; Hunter Decl. at ¶ 19; Jackson Decl. at ¶ 19; N. Gonzalez Decl. at ¶ 20; Hernandez Decl. at ¶ 20; M. Lawrence Decl. at ¶ 21; Appleby Decl. at ¶ 21; T. Green Decl. at ¶ 20; R. Viana Decl. at ¶ 20).

[43] HSG disputes Paragraph 49 to the extent Plaintiffs allege that HSG made an affirmative effort to avoid tracking AMs' time worked.  There is no evidence offered to support such an allegation.

[44] (Diaz Decl. at ¶ 6; Lopez Dep. at 133:19 – 136:2; Ramos Dep. at 105:23 – 106:8; Kelly Dep. at 237:23; Trevino Dep. at 54:1-18, 108:10-12, 110:18-21; Jamison Dep. at 63:17-20; Clark Dep. at 82:4 – 83:8; Cleveland Dep. at 101:14, 104:21; Heard Dep. at 122:20 – 123:4, 130:23 – 131:1, 134:1 - 135:10; V. Stewart Dep. at 40:12-20; Kreck Dep. at 113:23 – 114:19; Nunez Dep. at 47:2-15; 119:5-12; Wesson Dep. at 171:18 – 172:15; Rochon Dep. at 35:1-16; Baez Dep. at 147:15 – 148:4).

[45] (Hackman Dep. at 57:21 – 59:16; Kozenchik Decl. at ¶ 10; Clark Dep. at 96:25 – 99:20; Dominguez Dep. at 106:1-11, 107:6-22; Jamison Dep. at 84:10 – 85:1; Kelly Dep. at 91:20-23, 92:12, 238:5-6; Heard Dep. at 137:11 – 138:8; R. Stephens Dep. at 76:13 – 78:14; Beegle Dep. at 61:24 – 62:18; Hardee Dep. at 114:9-21; McNeely Dep. at 193:11 – 195:1; J. Baez resume at 1; L. Harris resume at 1; M. Huckaby resume at 1; J. Salamone Decl. at ¶ 6; S. Kreck resume at 1; M. Montalvo Decl. at ¶ 10; S. Johnson resume at 1; J. Layne resume at 1; V. Stewart resume at 1; Dec. 2014 Banks Report at ¶ 8).

[46] To the contrary, a Plan of Correction is a tool the AM creates to improve the facility after a government inspection reveals deficiencies.  (Hurlock Dep. at 111:11-17).

6

54. Disputed to the extent that SUMF No. 54 suggests that AMs did not do these tasks.[48]

55. Disputed to the extent that SUMF No. 55 suggests that AMs did not do these tasks.[49]

56. Disputed to the extent that SUMF No. 56 suggests that AMs did not do these tasks.[50]

57. Disputed to the extent that SUMF No. 57 suggests that AMs did not do these tasks.[51]

59. Disputed to the extent that SUMF No. 59 suggests that AMs did not do these tasks.[52]

60. Disputed to the extent that SUMF No. 60 suggests that AMs did not do these tasks.[53]

61. Disputed to the extent that SUMF No. 61 suggests that AMs did not do these tasks.[54]

62. Disputed to the extent that SUMF No. 62 suggests that AMs did not do these tasks.[55]

64. Disputed to the extent that SUMF No. 64 suggests that AMs did not do these tasks.[56]

65. Disputed to the extent that SUMF No. 65 suggests that AMs did not do these tasks.[57]

---

[47] (Fleming Dep. at 37:10 – 38:16; Clark Dep. at 61:21 – 62:14; Cleveland Dep. at 88:8-12; Dominguez Dep. at 111:2 – 112:10; Trevino Dep. at 106:1 – 107:3; Kelly Dep. at 37:7-23; Barger Dep. at 239:11 – 240:10; Benford Dep. at 95:6-18; Bowman Dep. at 104:24 – 105:12; McNeely Dep. at 172:3-14; Modrak Dep. at 98:16-21; R. Stephens Dep. at 43:10-21).

[48] As explained throughout this Response, there is substantial evidence that AMs handle the business at the facility level.

[49] AMs are primarily responsible for payroll on a daily basis. They had access to and could alter employee time. (Hackman Dep. at 57:21 – 59:16, 141:7 – 142:13; Clark Dep. at 96:25 – 99:20; Dominguez Dep. at 106:1-11, 107:6-22; Jamison Dep. at 84:10 – 85:1; Kelly Dep. at 91:20-23, 92:12, 238:5-6; Heard Dep. at 137:11 – 138:8; R. Stephens Dep. at 76:13 – 78:14; Beegle Dep. at 61:24 – 62:18; Hardee Dep. at 114:9-21; McNeely Dep. at 193:11 – 195:1; Dec. 2014 Banks Report at ¶ 8; Hackman Dep. at 205:17 – 206:8; U. Hunt Dep. at 131:20-25; Trevino Dep. at 60:18 – 61:7; Cleveland Dep. at 108:24 – 110:112:14; Dominguez Dep. at 94:5-18; Heard Dep. at 185:19 – 186:18; I. McLean resume at 1; J. Kirk resume at 1; S. Kreck resume at 1; L. Harris resume at 1; J. Baez resume at 3; V. Stewart resume at 1; S. Smith resume at 2; A. Dominguez resume at 1; S. Gash resume at 1; A. Griffin resume at 1; J. Salamone Decl. at ¶¶ 6-7; M. Montalvo Decl. at ¶¶ 6-7; N. Gonzalez Decl. at ¶¶ 6-7, 9; J. Layne resume at 1).

[50] DMs cannot complete payroll without payroll confirmation sheet from AM. (Hackman Dep. at 205:17 – 206:8).

[51] (Hackman Dep. at 45:20 – 47:20; Bryant Decl. at ¶ 7).

[52] (Hackman Dep. at 111:5-23; Clark Dep. at 66:6-14; Cleveland Dep. at 82:13-25, 83:23, 106:4-21, 113:1-7, 133:5-15; Heard Dep. at 15:9-14, 69:1-6, 114:10 – 115:25; S. Johnson resume at 1; J. J. Layne resume at 1; J. Stewart resume at 1; J. Barger resume at 1; M. Benford resume at 1; J. Salamone Decl. at ¶¶ 6, 8; I. McLean resume at 1; M. Huckaby resume at 1; J. Stevens resume at 1; S. Gash resume at 1; A. Dominguez resume at 1; A. Griffin resume at 1; L. Harris resume at 1; M. Montalvo Decl. at ¶¶ 6, 8; N. Gonzalez Decl. at ¶¶ 6, 8-9).

[53] (Hackman Dep. at 116:16 – 119:4; Clark Dep. at 129:24 – 130:12; Hurlock Dep. at 130:16, 131:1-22).

[54] Disputed to the extent that Paragraph 61 suggests that business development is not a responsibility of an AM. (Hurlock Dep. at 89:19 – 90:4; Clark Dep. at 136:12-23; Heard resume at 1; J. Layne resume at1).

[55] (Hackman Dep. at 193:1 – 194:13 Clark Dep. at 61:21 – 62:14; Cleveland Dep. at 88:8-12; Dominguez Dep. at 111:2 – 112:10; Trevino Dep. at 106:1 – 107:3; Kelly Dep. at 37:7-23; Barger Dep. at 239:11 – 240:10; Benford Dep. at 95:6-18; Bowman Dep. at 104:24 – 105:12; McNeely Dep. at 172:3-14).

[56] (Hackman Dep. at 209:12 – 210:10).

[57] (Hackman Dep. at 48:7 – 49:2, 205:17 – 206:8; Heard Dep. at 75:20-22; U. Hunt Dep. at 144:15-20; Jamison Dep. at 106:22-24; Clark Dep. at 66:25 – 67:15; L. Harris resume at 1).

66. Disputed to the extent that SUMF No. 66 suggests that AMs did not do these tasks.[58]

67. Disputed to the extent that SUMF No. 67 suggests that AMs did not do these tasks.[59]

68. Disputed to the extent that SUMF No. 68 suggests that AMs did not do these tasks.[60]

69. Disputed to the extent that SUMF No. 69 suggests that AMs did not do these tasks.[61]

70. Disputed to the extent that SUMF No. 70 suggests that AMs did not do these tasks.[62]

## III.  INTRODUCTION

The Fifth Circuit has made clear that a party moving for summary judgment bears a "heavy burden," and "must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in its favor."[63]  Plaintiffs here, who seek summary judgment on a classwide basis, bear an even greater burden since they must show that there is not a *single* disputed material fact regarding the FLSA exemption status of any of the approximately 900 salaried Account Managers ("AMs") who have opted into this action.[64]  Such an extraordinary request requires extraordinary proof – and plaintiffs have none.  While plaintiffs cite isolated deposition testimony from opt-ins who say that they performed manual labor, the record is replete with evidence that AMs perform a host of managerial duties consistent with the executive and administrative exemptions to the FLSA.

---

[58] (Hackman Dep. at 193:1 – 194:13; Hackman Dep. at 193:1 – 194:13 Clark Dep. at 61:21 – 62:14; Cleveland Dep. at 88:8-12; Dominguez Dep. at 111:2 – 112:10; Trevino Dep. at 106:1 – 107:3; Kelly Dep. at 37:7-23; Barger Dep. at 239:11 – 240:10; Benford Dep. at 95:6-18; Bowman Dep. at 104:24 – 105:12; McNeely Dep. at 172:3-14; Modrak Dep. at 98:16-21; R. Stephens Dep. at 43:10-21).

[59] (Kreck Dep. at 131:11 – 132:25).

[60] Plaintiffs' contention that DMs are "responsible for all activity within a district" is not supported by any evidence in the record and is far too vague to support Plaintiffs' summary judgment motion.  Indeed, all of the evidence cited by HSG herein regarding AMs' responsibilities refutes Plaintiffs' SUMF No. 68.

[61] (Hardee Dep. at 59:20 – 70:20; Bryant Decl. at ¶ 15; Yates Decl. at ¶ 2; Kelly Dep. at 111:19-22, 195:19 – 196:2, 198:1-2, 237:15-19; Clark Dep. at 28:25 – 30:14, 43:1-18, 99:25 – 101:25, 118:1-20; Trevino Dep. at 88:14 – 89:25; Jamison Dep. at 48:1-24; Heard Dep. at 103:11- 107:16; Kern Dep. at 125:2 – 129:3; Kreck Dep. at 163:13 – 164:2; R. Stephens Dep. at 42:15-16, 45:5-47:9, 138:21 – 139:11, Williams Dep. at 34:11-21; Wimer Dep. at 117:25 – 118:16; Wofford Dep. at 122:20 – 125:21).

[62] (J. Baez Dep. at 134:14 – 135:3; Hardee Dep. at 141:2 – 142:6; Cleveland Dep. at 64:14-24, 255:18-21; Heard Dep. at 149:14-17; Clark Dep. at 62:4-6; Trevino Dep. at 113:13 – 114:12; Dec. 2014 Banks Report at ¶ 60).

[63] *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis added).

[64] *See, e.g., Von Friewalde v. Boeing Aerospace Operations, Inc.*, 339 Fed.Appx. 448, 461 (Aug. 4, 2009) (affirming summary judgment against all opt-in plaintiffs who failed to submit evidence in support of their claims).

Plaintiffs' request for relief is literally unprecedented – they do not cite even a *single decision*, from *any court*, granting collective-wide summary judgment for Plaintiffs in an FLSA exemption lawsuit involving the administrative or executive exemption.  The motion for summary judgment is unsupported by either the evidence or the law, and should be denied.

## IV.  ARGUMENT

### A.  Plaintiffs Ignore The Summary Judgment Standard In A Collective Action.

Plaintiffs have not demonstrated the absence of genuine disputes as to material facts as is required for the issuance of summary judgment.[65]  Throughout their motion, Plaintiffs cite individual testimony from specific plaintiffs and isolated statements by HSG's representatives taken out of context, while ignoring the substantial contrary evidence throughout the record.  In some instances, Plaintiffs approach the bounds of ethical conduct, asserting "facts" while citing portions of the record that have no possible relevance to Plaintiffs' purported "facts."[66]  Courts have soundly rejected summary judgment motions brought by plaintiffs in FLSA collective actions who ignore evidence that does not support their position, as Plaintiffs have done here.[67]

Notably, Plaintiffs rely heavily on the Eleventh Circuit's decision in *Morgan v. Family Dollar Stores, Inc.*[68]  Critically, however, *Morgan* did not involve a summary judgment decision.  Rather, it involved an appeal of a jury verdict following an eight-day trial on the merits.[69]  In

---

[65] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 454 (5th Cir.2005).

[66] *See, e.g.*, footnotes 13, 17, 21, 28 and 34, *supra.*

[67] *See Killion v. KeHE Distributors, LLC*, 761 F.3d 574, 585 (6th Cir. 2014) (noting that "[t]he evidence here is, at the very least, in conflict" regarding whether the plaintiffs met the "outside sales" exemption from overtime under the FLSA and reversing the district court's grant of summary judgment in favor of plaintiffs); *Belle v. University of Pittsburgh Medical Center*, 2014 WL 4828899, at *4 (W.D. Pa., Sept. 29, 2014) (denying plaintiffs' motion for summary judgment in FLSA collective action and holding that "Defendants have identified a plethora of material disputed facts, and Plaintiffs' cherry-picking of the evidence arguably flirts with the bounds of Rule 11.").

[68] 551 F.3d 1233 (11th Cir. 2008).

[69] *Id.* at 1247-48.

fact, the court's discussion in *Morgan* highlights precisely why summary judgment is ill-suited to FLSA collective actions that involve overtime exemptions.  As the *Morgan* court held:

> [W]e have noted the necessarily fact-intensive nature of the primary duty inquiry, that the answer is in the details, and that where an issue turns on the particular facts and circumstances of a case, it is not unusual for there to be evidence on both sides of the question, with the result hanging in the balance.  And the result reached must be left intact if there is evidence from which the decision maker, the jury in this instance, reasonably could have resolved the matter the way it did.[70]

Thus, summary judgment is wholly improper on the question of exempt status, whether the case proceeds individually or as a collective action.[71]

### B. Genuine Issues Of Material Fact Exist Regarding Whether Salaried AMs Were Properly Classified As Exempt.

Plaintiffs challenge HSG's affirmative defense that AMs are not entitled to overtime payments because they qualify as exempt executive employees.  29 C.F.R. § 541.100 provides:

> (a) The term "employee employed in a bona fide executive capacity" in section 13(a)(1) of the Act shall mean any employee:
>
> (1) Compensated on a salary basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities;
>
> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
>
> (3) Who customarily and regularly directs the work of two or more other employees; and
>
> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing,

---

[70] *Id.* at 1269.

[71] As the Court is aware, HSG asserts that this case is not appropriate to proceed as a collective action, and it has filed motions to decertify both classes of plaintiffs.  (Dkt. # 233 and 235).  Should the Court grant the motion for decertification of the class of salaried AMs, the present Motion shall become moot.  *See Alberton v. Commonwealth Land Title Inc. Co.*, 299 F.R.D. 109, 119 (E.D.Pa. 2014) ("Plaintiff's Motion for Summary Judgment seeking a judgment on the merits as to the entire class is moot as there is no longer a class.").

10

advancement, promotion or any other change of status of other employees are given particular weight.

Plaintiffs concede prongs (1) and (4), and instead focus their argument on prongs (2) and (3), arguing that: (1) an AM's primary duty is not management of the housekeeping department; and (2) AMs do not customarily and regularly direct the work of two or more employees.

Department of Labor regulations elucidate the type of work that constitutes "management:"

> Generally, "management" includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.[72]

The regulations provide a list of factors and issues to consider in determining whether the employee's "primary duty" is management: "Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee."[73]

---

[72] 29 C.F.R. § 541.102.
[73] 29 C.F.R. § 541.700(a).

11

As described below, there is substantial evidence in the record from which a reasonable jury could conclude that each of these factors is met.

### 1. There Are Genuine Disputes Of Material Fact Concerning The Amount Of Time AMS Spend Performing Exempt And Nonexempt Work.

Although time spent performing exempt and nonexempt work can be a factor in the determination whether an employee is employed in a *bona fide* executive capacity, "[t]ime alone . . . is not the sole test . . ."[74] As the regulation explains:

> [N]othing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion.
>
> Thus, for example, assistant managers in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing payment of bills may have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register.[75]

Consistent with this regulation, the Fifth Circuit has expressly discounted the importance of this factor in determining whether an employee's primary duty is management.[76]

Plaintiffs acknowledge, as they must, that the amount of time they spent performing exempt and nonexempt work is not dispositive of their claim.[77] Nonetheless, they claim that

---

[74] 29 C.F.R. § 541.700(b).

[75] *Id.*

[76] *See Lovelady v. Allsup's Convenience Stores, Inc.*, 304 F. App'x 301, 305 (5th Cir. 2008) ("In fact, exempt work may be an employee's primary duty even though such work occupies less than half her time if the other pertinent factors support such a conclusion. We have directed lower courts that the essence of the test is to determine the employee's chief or principal duty.") (quotations omitted); *Smith v. City of Jackson, Miss.*, 954 F.2d 296, 299 (5th Cir. 1992) (reversing jury verdict in favor of fire chiefs and deputy chiefs; holding even though "vast majority" of plaintiffs' time was spent waiting to respond to fires and doing routine, nonexempt tasks, their primary duty was supervising firefighters when responding to fires); *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1227 (5th Cir. 1990) ("an employee's "primary duty" cannot be ascertained by applying a simple "clock" standard that contrasts the amount of time each day an employee spends on exempt and nonexempt work.").

[77] (Plaintiffs' Brief at 18).

12

there is "no genuine issue of material fact that Plaintiffs spent the vast majority of their time performing manual labor."[78]  This is simply false.  Plaintiffs ignore the 39 declarations HSG submitted in its motion to decertify the class, along with the expert report concluding that "the vast majority of Account Managers in this study spent more than 50% of their time performing exempt work."[79]  Rather than acknowledging the vast contrary evidence, Plaintiffs take a defensive posture, arguing that they did not perform "concurrent" management and non-management duties as described in 29 C.F.R. § 541.106.  The evidence suggests otherwise.

Section 541.106 provides:  "Concurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption if the requirements of § 541.100 are otherwise met. . . . Generally, exempt executives shall make the decision regarding when to perform nonexempt duties and remain responsible for the success or failure of business operations under their management while performing the nonexempt work."

There is substantial evidence in the record from which a jury could conclude that AMs perform management duties concurrently with any non-management duties.  For example, one AM testified that, she was responsible for the day-to-day management of the department while she cleaned, explaining: "While I was working, I would observe." [80]  Another testified: "I made sure that the housekeepers got everything taken care of on a day-to-day basis.  I'd work with the staff to make sure that got done."[81]  He also confirmed that he supervised employees while he performed any cleaning work he chose to do:

> Q. But on a day-to-day basis there at the facility, you supervised the employees, correct?
>
> [objection]

---

[78] (Plaintiffs' Brief at 18).
[79] (Dkt. 235, Exs. 1-39; Dec. 2014 Banks Report at ¶ 4).
[80] (Clark Dep. at 60:1-14, 93:5-14, 103:2-6).
[81] (Cleveland Dep. at 100:11-14).

A. I would say that it was set to be – it was supposedly a supervisory position.  But you mainly worked alongside of your staff.  You worked with them to get it done on a day-to-day basis.

Q. Okay. And while you were doing that manual labor, you also had to make sure that they were doing what they had to do, right?

[objection]

A. I had to – yeah, I had to go see them.[82]

Many others provided similar testimony.[83]  This testimony is consistent with HSG's expert's conclusion that "when Account Managers perform these nonexempt tasks, they most often do so for a managerial purpose."[84]

With regard to employees who perform both exempt and nonexempt tasks, the regulation states: "Generally, exempt executives shall make the decision regarding when to perform nonexempt duties."[85]  There is substantial evidence that AMs independently decide whether and when to perform cleaning tasks, which further supports application of the exemption.[86] Thus, as described in § 541.106, there is evidence in the record from which a reasonable jury could conclude that AMs are *bona fide* executive employees.

---

[82] (Cleveland Dep. at 101:2-11; Barger Dep. at 231:1-17; Beegle Dep. at 58:8-24; Hackman, 130:22-131:7; Lopez, 138:2-23).

[83] (Barger Dep. at 231:1-17; Beegle Dep. at 58:8 – 59:24; Hilburn Dep. at 63:17 – 65:13; J. Salamone Decl. at ¶ 16; M. Montalvo Decl. at ¶ 18; N. Gonzalez Decl. at ¶ 17; Jones Decl. at ¶ 17; J. Hunt Decl. at ¶ 17).

[84] (Dec. 2014 Banks Report at ¶ 6).

[85] 29 C.F.R. § 541.106.

[86] *See* Clark Dep. at 94:1-11 (if she saw things that needed to be corrected she would sometimes delegate the work, but she often chose to do it herself because it was "[t]ime-consuming.  It's easier to just go ahead and do it."); Cleveland Dep. at 151:11-16 (AM decided whether to do quality check inspections or manual cleaning work on a given day based on his own personal approach); (Dominguez Dep. at 131:22 – 132:4) (AM testified that he often chose to do cleaning work rather than performing his QCI's, and that no one instructed him to prioritize his work in such a manner.); Cleveland Dep. at 160:25 – 161:3 (AM chose to do manual cleaning work during the day, rather than his various management duties, because it enabled him to manage his schedule in such a way that he would finish earlier at the end of the day.); (Clark Dep. at 72:9-14) (if an employee called out she typically chose to do the absent employee's work herself out of a fear that it otherwise would not get done properly – even though she had the authority to shift around work and increase another employee's workload to cover the absence); *see also* Jamison Dep. at 183:4-23).

14

Plaintiffs cite *Grace v. Family Dollar Stores, Inc.*[87], in which the Eleventh Circuit granted summary judgment *for the employer* on the plaintiff's FLSA exemption claims. Plaintiffs attempt to distinguish *Grace* by arguing that, unlike the plaintiff in that case, who spent 99% of her time performing manual labor, AMs do not have responsibility for "operating the store profitably." [88] This argument misconstrues both the holding in *Grace* and the importance of the AM in terms of HSG's client relations and retention.

The overall question is whether the employee's primary duty is "management of the enterprise," not, as Plaintiffs suggest, whether the employee is responsible for the enterprise's profitability. [89] In the context of a retail store, profitability is a key metric for determining how the enterprise is managed.  As the court in *Grace* noted, the plaintiff was in charge of making her store profitable, and, therefore, she engaged in tasks that ensured profitability, such as monitoring staffing, avoiding shrinkage, waste, breakage of inventory and theft.[90]  As the court explained: "To be sure, each of these tasks was nonmanagerial, but she performed these tasks in the context of her overall responsibility to see that the store operated successfully and profitably, and they were important to fulfilling her goals and responsibilities."[91]

Here, unlike in a retail store, the "sale" has already taken place once HSG enters into a contract with its client, and the AM's primary goal is to fulfill the contract by managing the housekeeping department and making sure the client remains satisfied with HSG's services. This important distinction was explained by HSG's 30(b)(6) deponent, John Kelly, who testified:

> It's a relationship business with a 30-day cancellation clause.  For
> us to be able to have that retention rate over four decades, we have

---

[87] 637 F.3d 508 (4th Cir. 2011).
[88] (Plaintiffs' Brief at 19).
[89] 29 CFR § 541.100(a)(2). Even if profitability were the relevant inquiry, there is substantial evidence that Plaintiffs were directly responsible for HSG's profitability.  (S. Johnson resume at 1 ("Responsible for the facilities['] profitability . . ."; J. Barger resume at 1 ("Responsible for the achievement of profitability and quality goals.")).
[90] *Id.* at 515-16.
[91] *Id.*

15

to be able to promote communications between the account manager and the administrator.

It's absolutely the rubber hitting the road and the foundation of the company.   Otherwise, we would just be going in, turning the buildings over each year so we could make a buck and leave, which is not the only objective.   We want to have a long-term relationship, we want to have retention, which we built [on] a good relationship.

I have 10,000 employees, four salespeople.   I grew 20 percent last year.   It's not sales.   It's satisfied customers asking us for more help.   So it's key to have the account managers do that.[92]

Consistent with Kelly's testimony, AMs testified that their primary responsibility is to ensure that the facility meets the client's standards.[93]   Indeed, HSG's expert concluded that AMs "perceive[] that 'Overseeing Service Quality and Facility Safety,'[and] 'Managing Client Relations' . . . were the most important components of their job."[94]   Likewise, a review of Plaintiffs' resumes produced in this case, in which Plaintiffs describe their AM positions in their own words, confirms this.[95]   Thus, consistent with Grace, substantial evidence in the record would support a reasonable jury's conclusion that AMs were responsible for managing the enterprise in which they worked and properly classified as exempt.

---

[92] (Kelly Dep. at 168:6-19).

[93] See, e.g., Cleveland Dep. at 47:20-21 ("We're just pretty much making sure the facility runs."); Id. at 92:22 – 93:1 ("[T]hey put me in The Brian Center because of . . . the quality of work that I've got out of my staffs in a place like that is what was necessary to keep the client happy."); Heard Dep. at 66:6-14 (facility administrator came to her with housekeeping problems ("[b]ecause I was in charge."); Jamison Dep. at 109:22-25.

[94] (Dec. 2014 Banks Report at ¶ 11).

[95] See, e.g., S. Johnson resume at 1 ("Responsible for all day to day environmental services operations at a senior living facility and a staff of 30 employees."); J. Layne resume at 1 ("Handle the day-to-day organization of running the facility with over 100 residents [and] Managing a staff between 10-25 employees"); Mickel A. Smith resume at HCS05055 ("Primary duties include . . . "[p]lanning, organizing, and developing of the overall operation of the housekeeping department in accordance with federal , state and local standards and guidelines . . ."); J. Stevens resume at HCS05059 ("Manage staff and operations for environmental service procedures in contracted nursing homes and facilities"); J. Baez resume at 4 ("Managed and Maintain four Nursing / Rehab Centers in the Bradenton Area."; R. Heard resume at 1 ("Supervise and direct the work activities of 15-20 cleaning personnel within a long-term health care facility to ensure rooms are fresh, orderly and ready for patients.").

### 2. There Are Genuine Issues Of Material Fact Regarding The Relative Importance Of AMs' Exempt And Nonexempt Work.

The next factor is the relative importance of the employee's exempt work versus his non-exempt work, which focuses on the importance the employer places on the work.[96] "[C]ourts must compare the importance of the plaintiff's managerial duties with the importance of her non-managerial duties, keeping in mind the end goal of achieving the overall success of the company."[97]

Rather than citing any evidence to suggest that HSG values AMs' nonexempt work more than their exempt work, Plaintiffs attempt to shift the focus from AMs to DMs, arguing that DMs are the "most important position to HSG."[98] The implication appears to be that the Court should assume that, because HSG values DMs as managers, it values AMs' managerial responsibilities less than their non-managerial responsibilities. The Court should reject this logical fallacy, especially where all inferences must be made in favor of HSG.[99] In fact, the Sixth Circuit in *Thomas* rejected this very argument, where the plaintiffs argued that there was evidence that the nonexempt employees were more important to the company's success than were the exempt employees.[100] As the Sixth Circuit held: "This assertion, even if it were true, completely misses the focus of the first factor by improperly considering *who* is more important, rather than *which category of job duties* is more important."[101]

Plaintiffs also argue that AMs' management of employees is not important to HSG because AMs do not have the ability to prepare or alter line employees' daily job routines. This

---

[96] *Dalheim, supra,* 918 F.2d at 1227 ("[A]n employee's primary duty will usually be what she does that is of principal value to the employer, not the collateral tasks that she may also perform, even if they consume more than half her time.") (footnotes omitted).

[97] *Thomas v. Speedway SuperAmerica, LLC,* 506 F.3d 496, 505 (6th Cir.2007) (citing *Donovan v. Burger King Corp.,* 675 F.2d 516, 521 (2d Cir. 1982)).

[98] (Plaintiffs' Brief at 22).

[99] *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

[100] 506 F.3d at 505.

[101] *Id.* (emphasis added).

argument is contrary to substantial evidence in the record.[102]  In addition to evidence concerning

the active role AMs take with regard to job routines, there is a plethora of testimony regarding

critical management tasks that AMs independently perform that would not take place in the

AMs' absence,[103] such as:

- Recruiting candidates, reviewing applications, interviewing, hiring, and training new line employees, in some cases on a monthly basis.[104]

- Acting as the day-to-day HSG representative and intermediary between HSG and its client, and ensuring good "client relations."[105]

- Creating and enforcing HSG's policies with regard to line employees and ensuring that those policies are being followed, including safety policies.[106]

- Being, in the client's eyes, the "Department Head"[107] or the "Director of Housekeeping"[108] or "in charge,"[109] and attending daily meetings with the facility's Administrator and other department heads.[110]

---

[102] Ex. 48 to Plaintiffs' Motion at 3 expressly states that AMs may change a job routine with the DM's approval. There is evidence that AMs may and do create and alter job routines.  (S. Smith resume at 2; Hackman Dep. at 116:16 – 119:4; Clark Dep. at 129:24 – 130:12; Hurlock Dep. at 130:16, 131:1-22).

[103] See also March 2015 Banks Report at ¶¶ 38-46, 48-51 (assessing AMs' self-reported involvement in administrative activities and decision-making and DMs' descriptions of AMs' involvement in same area.").

[104] (Kelly Dep. at 111:19-22, 195:19 – 196:2, 198:1-2, 237:15-19; Clark Dep. at 28:25 – 30:14, 43:1-18, 99:25 – 101:25, 118:1-20; Trevino Dep. at 88:14 – 89:25; Jamison Dep. at 48:1-24; Heard Dep. at 103:11- 107:16; Kern Dep. at 125:2 – 129:3; Kreck Dep. at 163:13 – 164:2; R. Stephens Dep. at 42:15-16, 45:5-47:9, 138:21 – 139:11, Williams Dep. at 34:11-21; Wimer Dep. at 117:25 – 118:16; Wofford Dep. at 122:20 – 125:21; S. Smith resume at 2; V. Stewart resume at 1; J. Layne resume at 1; J. Baez resume at 3; S. Gash resume at 1; L. Harris resume at 1; M. Smith resume at 2; J. Kirk resume at 1; I. McLean resume at 1; J. Salamone Decl. at ¶¶ 6, 14-15; C. Corbin resume at 3; S. Johnson resume at 1; J. Barger resume at 1; M. Montalvo Decl. at ¶¶ 15-17; N. Gonzalez Decl. at ¶¶ 14-16; Jones Decl. at ¶¶ 15-16; Hernandez Decl. at ¶¶ 6, 16; J. Hunt Decl. at ¶¶ 6, 15-16).

[105] (Clark Dep. at 61:21 – 62:14; Cleveland Dep. at 88:8-12; Dominguez Dep. at 111:2 – 112:10; Trevino Dep. at 106:1 – 107:3; Kelly Dep. at 37:7-23; Barger Dep. at 239:11 – 240:10; R. Benford Dep. at 95:6-18; Bowman Dep. at 104:24 – 105:12; McNeely Dep. at 172:3-14; Modrak Dep. at 98:16-21; Stevens Dep. at 43:10-21; S. Johnson resume at 1; J. Layne resume at 1; S. Smith resume at 2; L. Harris resume at 1; V. Stewart resume at 1).

[106] (Kelly Dep. at 237:23; Trevino Dep. at 54:1-18, 108:10-12, 110:18-21; Jamison Dep. at 63:17-20; Clark Dep. at 82:4 – 83:8; Cleveland Dep. at 101:14, 104:21; Heard Dep. at 122:20 – 123:4, 130:23 – 131:1, 134:1 - 135:10; V. Stewart Dep. at 40:12-20; Kreck Dep. at 113:23 – 114:19; Nunez Dep. at 47:2-15; 119:5-12; Wesson Dep. at 171:18 – 172:15; Rochon Dep. at 35:1-16; Baez Dep. at 147:15 – 148:4; J. Stevens resume at 1; C. Corbin resume at 3; S. Johnson resume at 1; S. Smith resume at 2; J. Barger resume at 1; Jones Decl. at ¶ 14; Hernandez Decl. at ¶ 14).

[107] (Clark Dep. at 61:3-5; McNeely Dep. at 182:17 – 183:16).

[108] (Cleveland Dep. at 145:2-12; Hardee Dep. at 128:5 – 129:12; A. Dominguez resume at 1).

[109] (Heard Dep. at 66:6-14). See also S. Johnson resume at 1 ("Responsible for all day-to-day environmental services operations at a senior living facility and a staff of 30 employees.").

SL1 1362992v3 104212.00240

- Resolving disputes among employees and responding to employee complaints.[111]

- Performing supply inventory and purchasing things like chemicals and linens within a budget.[112]

- Maintaining and updating employee files to which only the AM and, in some cases, the facility administrator, had access.[113]

- Deciding whether and when to discipline employees up to and, in some cases, including, termination.[114]

The decision in *Mims v. Starbucks Corp.*[115] is instructive.  There, Starbucks store managers alleged that they were "glorified baristas" who primarily performed the duties of the hourly employees they supervised, such as pouring coffee and working the cash registers.[116]  The Court rejected this argument and granted summary judgment for the defendant, relying on the fact that the managers were "the highest ranking employees in their respective stores" as proof that their managerial tasks were more important to the company.[117]  As the court explained: "If Plaintiffs while each managing a store with annual sales exceeding $1 million were able to spend 70 or 80 percent of their time pouring coffee and performing other barista chores that six to 30 subordinates also performed, those activities of the manager quite obviously were of minor

---

[110] (Jamison Dep. at 108:19-24; Clark Dep. at 111:16-23; Trevino Dep. at 103:24 – 104:6; Cleveland Dep. at 166:17-21; Kelly Dep. at 37:7-23, 238:8-11; Wajer Dep. at 126:15 – 127:1; Wimer Dep. at 52:9 – 53:10; Phebus Dep. at 143:13 – 144:13; Brooks Dep. at 113:10 – 114:18; J. Salamone Decl. at ¶ 17; M. Montalvo Decl. at ¶¶ 12, 19; N. Gonzalez Decl. at ¶¶ 18-19).

[111] (Clark Dep. at 91:8-25; Trevino Dep. at 129:18-130:1; Cleveland Dep. at 206:14, 207:22-25; Corbin Dep. at 218:18-25; Modrak Dep. at 74:7-16; J. Layne resume at 1).

[112] (Clark Dep. at 96:25 – 99:20; Dominguez Dep. at 106:1-11, 107:6-22; Jamison Dep. at 84:10 – 85:1; Kelly Dep. at 91:20-23, 92:12, 238:5-6; Heard Dep. at 137:11 – 138:8; R. Stephens Dep. at 76:13 – 78:14; Beegle Dep. at 61:24 – 62:18; Hardee Dep. at 114:9-21; McNeely Dep. at 193:11 – 195:1; Dec. 2014 Banks Report at ¶ 8; S. Johnson resume at 1; J. Layne resume at 1; V. Stewart resume at 1; J. Hunt Decl. at ¶ 10).

[113] (Cleveland Dep. at 182:6-19, 185:24 – 188:13; Jamison Dep. at 83:13 – 84:9; Heard Dep. at 79:14 – 80:3; Hardee Dep. at 131:2-15; Gash Dep. at 107:7 – 108:7; Hackman Dep. at 101:1-14; Kern Dep. at 98:14 – 99:2; Modrak Dep. at 27:17 – 28:8; S. Smith resume at 2; J. Baez resume at 3).

[114] (Kelly Dep. at 114:2-6, 138:2-4, 191:17-23; Cleveland Dep. at 243:3-16; Dominguez Dep. at 147:24-25; Heard Dep. at 86:9 – 87:23, 89:1 – 91:17; R. Stephens Dep. at 50:10-12; Carroll Dep. at 212:24 – 216:14; Moore Dep. at 123:12 – 125:13; Hackman Dep. at 131:22 – 134:25; McAuley Dep. at 138:13-22; Fox Dep. at 145:25 – 146:7; S. Smith resume at 2; J. Kirk resume at 2; J. Salamone Decl. at ¶ 6).

[115] 2007 WL 10369 (S.D. Tex. Jan. 2, 2007).

[116] *Id.* at *1.

[117] *Id.* at *6.

importance to Defendant when compared to the significant management responsibilities performed during the other 20 to 30 percent of their time . . ."[118]

Here, as in *Mims*, it is undisputed that AMs were both the highest-paid and the highest ranking HSG employee in their facilities.[119]  While AMs may do some manual labor, their primary duty is management of contracts valued at half a million dollars.  As HSG's 30(b)(6) deponent, John Kelly, explained in his deposition:

> [AMs] have the same basic core function, which is management. They are our representative at the facility.  They are always going to be responsible to be fully staffed, recruit, do . . . inspecting and training and procuring and customer service. . . .
>
> Our average contract carrying the labor and the supplies and the housekeeping division is between 5 and 10 thousand dollars a week. . . . So the account manager is actively managing a 250- to 500-thousand-dollars-a-year contract.[120]

Thus, there is a triable issue of fact regarding the relative importance of AM's management and non-management duties.[121]

### 3. Genuine Issues Of Material Fact Exist Regarding Whether Plaintiffs Had Relative Freedom From Direct Supervision.

There is substantial evidence in the record that AMs have relative freedom from direct supervision.  Plaintiffs argue that they were directly supervised by their respective DMs, but the evidence shows that, for the vast majority of AMs, that simply was not the case.  Mr. Kelly summarized the ways in which AMs must exercise independent judgment and discretion:

> Related to hiring employees, an interview, their appearance, the professionalism of being around residents.  It would be very important for the manager to exercise judgment to have respectable

---

[118] *Id.*

[119] (Kelly Dep. at 37:24-25, 241:14-18; Clark Dep. at 47:18 – 48:23; Cleveland Dep. at 32:12 – 33:6; Dominguez Dep. at 53:3-5; Jamison Dep. at 36:21-25; Heard Dep. at 54:6-12; M. Montalvo Decl. at ¶ 5; N. Gonzalez Decl. at ¶ 5; Jones Decl. at ¶ 5; M. Lawrence Decl. at ¶ 5; B. Roeder Decl. at ¶ 5).

[120] (Kelly Dep. at 235:13 – 236:12).

[121] (Cleveland Dep. at 71:18-19, Trevino Dep. at 122:9-14, 134:13-21; Dominguez Dep. at 99:2-10 (line employees required to follow "chain of command" and contact AM first).

20

> employees within the facility. . . . Exercise judgment as it relates to
> the right way to respond to customer requests, to prepare for state
> surveys, to counsel an employee, to prepare a facility for a survey,
> to interact with a family member . . .
>
> On a daily basis, everything that goes on within the facility
> requires a manager to interpret it and to follow up in a way that
> represents the company well and provides the services we're
> contracted to do.[122]

He explained that an AM must exercise discretion in these areas because the DM has "ten

buildings [and] there's no way that a district manager would be on-site at ten facilities."[123]

Plaintiff Cleveland's experience is enlightening. He testified that the DM visited his

facility "[o]nce every month or two. Every now and then it would be a good three-month

span."[124] Cleveland also testified that, during his first two weeks as an AM, he frequently called

his DM for detailed instructions but he stopped doing so after the DM responded: "[D]o I have to

keep telling you this? Go do the job."[125] Indeed, several AMs testified that they wished their

DMs were *more* involved at their facilities.[126] This directly contradicts Plaintiffs' claims that

DMs were performing regular, daily supervision on site.[127]

Even with regard to those DMs who were available to AMs on a regular basis, substantial

evidence indicates they did not directly supervise those AMs. One AM testified that her DM

visited the facility once a week or once every two weeks, but that when doing so the DM spent

most of his time with the Administrator, rather than with the AM.[128] Another DM would visit

---

[122] (Kelly Dep. at 238:23 – 239:16).
[123] (Kelly Dep. at 237:16-18).
[124] (Cleveland Dep. at 255:18-21).
[125] (Cleveland Dep. at 64:14-24).
[126] (Heard Dep. at 149:14-17).
[127] *See also* J. Salamone Decl. at ¶ 4 (DM visited once per month); M. Montalvo Decl. at ¶ 13 ("My District
Manager is not involved in my daily [quality check inspections], and it is within my sole discretion how to
conduct the evaluations."); Jones Decl. at ¶ 4 (DM visits once per month and "does not micromanage me."); J.
Hunt Decl. at ¶ 4 ("I try to keep [my DM] out of the loop and take care of issues as much as possible, and if I
can resolve an issue without involving [the DM], I will. I have been with HSG for a long time, so there are not
many issues that I would not know how to handle."); N. Gonzalez Decl. at ¶ 4.
[128] (Clark Dep. at 62:4-6).

for as little as ten minutes "because he had other buildings to go to."[129]  Also relevant on this

point is HSG's expert's determination that:

> [G]reater than 70% of the Account Managers reported making the
> final decision in the following areas: "making training schedules
> for new employees," "who should provide hands-on training for
> new employees," "whether an employee has been trained
> properly," "whether to cross-train employees to perform different
> functions," "which applicants to hire," "how to correct employees'
> missed time clock punches," "how to schedule employees' shifts,"
> "when to schedule special projects," "when to complete the
> employee work schedule," "when to make changes to the work
> schedule," "how to adjust staffing for call-outs," "whether to allow
> employees to leave early or stay late," "whether to approve
> vacation or time-off requests," "which employees to assign
> specific projects," "when to have staff meetings," "the content of
> staff meetings," "what inventory to order," "how inventory should
> be allocated to employees," "which supplies should be secured,"
> and "who to give access to locked inventory."[130]

Several decisions support the conclusion that Plaintiffs have relative freedom from direct

supervision.  In *Thomas v. Speedway Superamerica, LLC*[131] the plaintiff argued that she was not

free from direct supervision because her district manager "visited her store at least twice every

week and maintained constant supervisory authority over her store twenty-four hours a day,

every day, via telephone and e-mail."[132]  The Sixth Circuit rejected this argument, holding that

"[t]his testimony indicates that [the district manager] remained constantly available to his store

managers, but in no way implies that he maintained constant contact with or supervision over his

store managers via telecommunications."[133]  As the court explained: "[A]ctive supervision and

periodic visits by a district manager do not eliminate the day-to-day discretion of the on-site

store manager."[134]  The court concluded: "Even though Thomas's discretion was somewhat

---

[129] (Trevino Dep. at 113:13 – 114:12).
[130] (Dec. 2014 Banks Report at ¶ 60).
[131] 506 F.3d 496 (6th Cir. 2007).
[132] *Id.* at 506.
[133] *Id.*
[134] *Id.* at 507 (*citing Murray v. Stuckey's Inc.*, 50 F.3d 564, 570 (8th Cir. 1995)).

circumscribed by her district manager's supervision and Speedway's standardized operating procedures, she *daily* exercised discretion over matters vital to the success of her station."[135]

Similarly, in *Mims,* the plaintiffs argued that they worked under the "ultimate managing authority of their district managers, who had authority to hire more senior employees, approve changes to Plaintiffs' work schedules, set rates of pay for newly-hired employees . . . and establish guidelines for Plaintiffs when completing performance reviews."[136]  The court rejected this argument and granted summary judgment for Starbucks, holding: [T]he manager of a local store in a modern multi-store organization has management as his or her primary duty even though the discretion usually associated with management may be limited by the company's desire for standardization and uniformity."[137]  It added: "The case law is replete with decisions holding managers of retail establishments to be exempt, notwithstanding the need to obey corporate policies and/or follow the orders of their corporate superiors."[138]  The court concluded: "The fact that Plaintiffs' district managers had 'veto power' over some of Plaintiffs' discretionary, managerial decisions does not raise a fact issue that Plaintiffs' primary responsibility was not in management."[139]  The court rejected the plaintiffs' argument that the district managers frequently visited the stores, holding that "it is uncontroverted that each Plaintiff as store manager was the single highest-ranking employee in his particular store and was responsible for that store's day-to-day overall operations."[140]

Here, as in *Mims,* it is undisputed that Plaintiffs each were the highest-ranking (and highest-paid) HSG employee at his or her facility, and the *Thomas* and *Mims* decisions directly

---

[135] *Id.* (citations omitted).
[136] 2007 WL 10369, at *7.
[137] *Id.*
[138] *Id.* (quotation omitted).
[139] *Id.* (citation omitted).
[140] *Id.*

23

contradict Plaintiffs' argument that periodic oversight by DMs is the same as direct supervision. Therefore, a reasonable jury could conclude based on the evidence that Plaintiffs worked with relative freedom from direct supervision.[141]

### 4. Genuine Disputes Of Material Fact Exist Regarding The Relationship Between Plaintiffs' Salaries And The Wages Paid Other Employees.

There are also material factual disputes regarding the relationship between the AMs' salaries and the hourly wages paid to the employees they supervise.  Plaintiffs ask the court to divide each plaintiff's respective salary by the number of hours that plaintiff alleges he or she worked, and compare the resulting "hourly wage" with the hourly wage of the nonexempt employees.  There are at least two problems with Plaintiffs' argument.

First, other courts have declined to engage in such "mathematical gymnastics," opting instead to compare "the manager's weekly salary with the highest possible non-exempt weekly wage ...."[142]  This method of calculation is appropriate here, where Plaintiffs have offered no proof regarding the number of weekly overtime hours they worked, other than three selected Plaintiffs' unsupported allegations.[143]

Second, even if the Court were to adopt Plaintiffs' proposed method of calculation, this factor militates against summary judgment for Plaintiffs because it is undisputed that AMs were in fact the highest paid employees at each facility.  Plaintiffs cite *Jones v. Dolgencorp, Inc.*[144] Unlike the present case, *Jones* involved the *employer's* motion for summary judgment, and thus

---

[141] *See also* March 2015 Banks Report at ¶ 47 ("Responses from [DMs] paint a clear picture: Account Managers are subject to general and occasional oversight, and [DMs] do not manage the day-to-day operations of the facilities.").

[142] *Moore v. Tractor Supply Co.*, 352 F.Supp.2d 1268, 1278–79 (S.D. Fla. 2004); *Amash v. Home Depot USA, Inc.*, 24 F. Supp. 3d 214, 222 (N.D.N.Y. 2014).

[143] Indeed, accepting Plaintiffs' invitation to calculate wages in this manner would require the Court to determine the number of alleged hours for each individual plaintiff (for each week, since the plaintiffs did not work the same number of hours every week) and perform a calculation for each of the approximately 900 salaried AMs – and then determine average hourly wage at the facility where each worked, for a comparison.  In addition to constituting a factual dispute that cannot be determined at summary judgment, this is yet another example of why this case is not suitable for treatment as a collective action.

[144] 789 F. Supp. 2d 1090, 1109 (N.D. Iowa 2011).

24

the evidence was construed in the light most favorable to the *employee*.[145]  The court assumed

that the plaintiff's overtime estimate was accurate, and yet it still held that a reasonable jury

could find that the plaintiff's $2.20 per hour premium over hourly workers was "substantially

more."[146]  Plaintiffs also cite *Myrick v. Dolgencorp, LLC*.[147]  Again, *Myrick* involved the

employer's motion for summary judgment, and therefore the court accepted plaintiff's

calculations as true.  Even so, the court, relying on *Morgan*, held that a jury could conclude that

the supervisor's $2.85 per hour pay premium weighed in favor of exemption.[148]

In the present case, Plaintiff Dominguez testified that, according to his calculations, he

earned the equivalent of about $15.00 per hour.  Dominguez testified that he never questioned

why he made twice as much as the line employees because HSG was paying him well:

> Q. How much – most of the line staff earned around minimum wage, right?
>
> A. Correct.
>
> Q. So to your understanding, why would Healthcare Services Group pay you about twice as much to do the exact same work as them?
>
> [objection]
>
> A. You would have to ask them that.  I cannot answer that one, no.
>
> Q. Did you ever ask them why?
>
> A. They're paying me good.  Why am I going to complain?[149]

Other AMs provided similar testimony.[150]  In other words, many of the plaintiffs made at least

twice as much as the employees they supervised, and in most cases, far more than the $2 to $3

---

[145] *Id.*
[146] *Id.*
[147] 2010 WL 146874 (M.D. Ga., Jan. 11, 2010).
[148] *Id.* at *7.
[149] (Dominguez Dep. at 134:1-16).
[150] (Trevino Dep. at 98:13-21; Barger Dep. at 46:14 – 47:5; Underwood Dep. at 192:22 – 197:1; Fox Dep. at 63:14-25; Bowers Dep. at 28:10 – 29:8;  76:22-24; Rochon Dep. at 68:1-18, Phebus Dep. at 53:13 – 54:15; 108:20 –

difference that the courts in *Morgan* and *Jones* held was a substantial enough difference to defeat summary judgment. Thus, even applying Plaintiffs' disfavored method of calculation, this factor weighs in favor of HSG, and there are genuine issues of material fact regarding whether AMs were properly classified as exempt executive employees.

### C. HSG Has Submitted Substantial Evidence That It Acted In Good Faith.

Plaintiffs move for summary judgment on the issue of liquidated damages. This motion is premature, as Plaintiffs have not established that they are entitled to *any* damages. Asking for an award of liquidated damages at this stage in the proceedings is putting the cart before the horse, and courts regularly deny pretrial requests for liquidated damages as premature.[151]

In any event, there is a genuine issue of fact as to HSG's good faith. Under the FLSA, a court should not award liquidated damages "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938. . . ."[152] Here, there is substantial evidence in the record showing that HSG has made a good faith effort to determine whether the AMs should be classified as exempt or nonexempt.[153] For example, HSG conducted an in-depth reconsideration of its FLSA classification practices in 2004, when the regulations regarding the FLSA administrative and executive exemptions were most recently amended.[154]

---

109:2; Corbin Dep. at 95:2-14; Rivera Dep. at 105:5-16; Young Dep. at 27:16 – 28:9; Moore Dep. at 41:14-19; Waltman Dep. at 84:20 – 85:16).

[151] *McFeeley v. Jackson Street Entertainment, LLC*, 47 F.Supp.3d 260, 278 (D. Md. 2014); Bruback v. City of Albuquerque, 893 F.Supp.2d 1216, 1237 (D.N.M. 2012); *Hunter v. Sprint Corp.*, 453 F. Supp. 2d 44, 62–63 (D.D.C. 2006).

[152] 29 U.S.C. § 260.

[153] *See* HSG's Motion for Summary Judgment as to Willfulness (Dkt. # 261). Although the analysis for willfulness and good faith are not identical, the evidence submitted in connection with that motion is applicable to the good faith defense as well.

[154] *Id.*

Mr. Kelly testified that, in or around July 2004, HSG, through its then-president Tom Cook, learned that the FLSA exemption regulations had changed and began investigating whether the AMs and certain other employees were still eligible to be classified as exempt.[155] Cook attended a seminar presented by the law firm Cozen O'Connor regarding the newly amended regulations.[156] HSG's document production includes a number of documents from this time period that reflect HSG's ongoing investigation of the exemption issue. These documents were taken from the files of Cook, Tim McCartney (HSG's in-house counsel at the time), and Nick Marino (former director of HR at HSG). As Kelly testified, the "purpose of the document[s] was for the custodian[s] to educate themselves as to the exempt, nonexempt process in assessing, as a company, if we were complying."[157] The documents reflect that HSG collected and reviewed Department of Labor fact sheets, articles, case alerts, opinion letters, and seminar materials related to the exemption status of managerial employees like AMs.[158] Several of these documents have margin notes or underlining, showing that they were read and considered, and there are also handwritten notes discussing these same subjects.[159]

HSG's careful consideration of this issue culminated in a memo dated August 3, 2004 that is part of HSG's Policies and Procedures Manual. The memo explains that "FLSA requires us to pay our non-exempt employees overtime pay at time and one-half their regular rate of pay after working 40 hours in a workweek" but that certain "qualified" positions were exempt from overtime pay.[160] It further noted that definitions of the "qualified positions have been modified by the new regulations."[161] Notably, the memo warned that "the definition of an exempt

---

[155] Id.
[156] Id.
[157] Id.
[158] Id.
[159] Id.
[160] Id.
[161] Id.

SL1 1362992v3 104212.00240

employee has been re-defined to the extent that, at the facility level the only qualified salaried employees will be the Account Manager in housekeeping..."[162]  It further explains that, under the new regulations, Assistant Managers no longer qualify as exempt and "if paid a salary must be converted to an hourly paid employee, with hours worked recorded."[163]  Similarly, any other formerly salaried employees (besides AMs) would no longer qualify as exempt and would be converted to hourly pay.[164]  Notably, the memo does not state that all AMs will be classified as exempt, and specifically gives DMs or RMs the authority to "convert" AMs to hourly pay and instruct them to record their time.[165]

Nor did HSG's analysis stop in August of 2004.  As the evidence reflects, HSG continued monitoring the case law, and continues to analyze the exemption status of each AM on a case by case basis.[166]  Hurlock testified that the AM exemption decision is made on a facility-by-facility basis, based on the facility's size, number of employees, and "a lot of different variables."[167] There is no universal or blanket exemption as to AMs, and there is a class of hourly AMs in this very lawsuit.  Accordingly, there are genuine issues of material fact regarding HSG's good faith effort to properly classify AMs, and the Court should deny Plaintiffs' motion for summary judgment on this defense.

### D. Plaintiffs' Motion for Summary Judgment on HSG's "*De Minimis*" Affirmative Defense Is Premature.

In analyzing whether an activity is *de minimis*, courts examine: "(1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of

---

[162] *Id.* (Prior to 2004, some Assistant Managers were classified as salaried exempt under the former version of the regulations.).
[163] *Id.*
[164] (HCSG 00073).
[165] *Id.*
[166] *Id.*
[167] (Hurlock Dep. at 87:7-15).

compensable time; and (3) the regularity of the additional work."[168] "The test reflects the need to avoid split-second absurdities that 'are not justified by the actuality of the working conditions." [169] "There is no rigid mathematical formula for this, which remains *a fact question for the jury.*"[170]

Here, there are more than 900 class members, each with different allegations and different methods of proof. It would be inappropriate for the Court to grant summary judgment on this defense for the entire class when HSG has not had the opportunity to cross examine all class members and present evidence to show that any overtime worked by particular AMs was *de minimis.* The Court should deny Plaintiff's motion for summary judgment on this defense.[171]

## V. CONCLUSION

For the foregoing reasons, Defendant Healthcare Services Group, Inc. respectfully asks the Court to deny Plaintiffs' Motion for Summary Judgment on Defendant's Affirmative Defenses.

---

[168] *Chambers v. Sears Roebuck and Co.*, 428 F. App'x 400, 415 (5th Cir. 2011) (quotations omitted).
[169] *Id.* (quotations omitted).
[170] *Id* (emphasis added).
[171] The same is true with regard to HSG's offset, accord and satisfaction, payment, and release affirmative defenses. Plaintiffs have not shown that, of the 900 salaried AMs, there is not a single employee whose claims have been extinguished by accord and satisfaction or release, or may be subject to offset. It would be premature for the Court to enter judgment on those defenses as to the entire class at this point.

Respectfully submitted,                    Dated:  April 20, 2015


**CONSTANGY, BROOKS,**
**SMITH & PROPHETE, LLP**

Steven Moore (*admitted pro hac*
*vice*)
Colorado State Bar No:  23320
smoore@constangy.com
1625 17th Street, Third Floor
Denver, Colorado 80202
Telephone: 720-343-7540
Fax: 720-343-7541

**PROSKAUER ROSE LLP**

*s/KennethD.Sulzer*

Kenneth D. Sulzer (pro hac vice)
**LEAD COUNSEL FOR DEFENDANT**
**PER LOCAL RULE CV-11(a)**
CA State Bar No. 120253
ksulzer@proskauer.com
2049 Century Park East, 32nd Floor
Los Angeles, CA  90067-3206
Telephone: (310) 557-2900
Facsimile:  (310) 557-2193

**SIEBMAN, BURG, PHILIPS & SMITH LLP**

Michael C. Smith
Texas Bar No. 18650410
michaelsmith@siebman.com
113 East Austin Street
Marshall, TX  75670
Telephone:  (903) 938-8900
Facsimile:  (972) 767-4620

ATTORNEYS FOR DEFENDANT
HEALTHCARE SERVICES GROUP, INC.

SL1 1362992v3 104212.00240

## CERTIFICATE OF SERVICE

I, Brad M. Kushner, certify that on this date, the foregoing Defendant Healthcare Services Group, Inc.'s Sur-Reply to Plaintiffs' Motion to Conditionally Certify Collective Action and Send Notice to Class Members Pursuant to 29 U.S.C. § 216(b) was filed electronically and is available for viewing on the Court's ECF system.


/s/Brad M. Kushner


Date:   April 20, 2015


SL1 1362992v3 104212.00240