**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| **SANDRA KELLY, JANICE WALTMAN,** § | |
| **AND SYLVIA PATINO, INDIVIDUALLY** § | |
| **& ON BEHALF OF OTHERS SIMILARLY** § | |
| **SITUATED,** § | |
| § | |
| *Plaintiffs,* § | |
| § | **Case No 2:13-cv-00441-JRG** |
| v. § | |
| § | |
| **HEALTHCARE SERVICES GROUP, INC.,** § | |
| § | |
| *Defendant.* § | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Before the Court is the Motion to Decertify Collective of Salaried Account Managers

filed by the Defendant Healthcare Services Group (HSG) (Dkt. No. 235, "Mot."). The Plaintiffs

oppose the Motion (Dkt. No. 243, "Resp."). For the reasons set forth below, the Motion is

**DENIED**.

**OVERVIEW OF MOTION**

This is a motion to decertify the class in a class action lawsuit brought under the Fair

Labor Standards Act (FLSA). In this suit, a category of HSG employees called "account

managers" assert that they have been improperly characterized as exempt employees (thereby

being excluded from receiving overtime compensation) by HSG. The opt-in account managers

assert that their job is actually that of non-exempt, manual labor cleaning staff. HSG asserts that

the account manager job is that of an exempt supervisor and trainer. This Motion to Decertify,

generally, determines whether the opt-in account managers are "similarly situated" in their

collective action and consequently whether their case can properly proceed as a class action.

The case has an extensive history.  On October 17, 2013, the Court denied without prejudice the Plaintiffs first request to certify the class.  (Dkt. No. 38).  After six months of further discovery and a narrowing of the claims, the Court conditionally certified the class on May 2, 2014.  (Dkt. No. 65).  After nearly a year of discovery, HSG now moves to decertify the class in light of the evidence gathered.

The evidence that has been gathered by both sides is substantial.  The opt-in Plaintiffs present 2,964 pages of deposition testimony, 159 pages of corporate documents and emails, and a 20 page rebuttal expert report.  HSG presents 3,332 pages of deposition testimony, 314 pages of declarations, and 118 pages of expert reports.  Collectively, the Court has considered 6,934 pages of arguments, documents, emails, depositions, declarations, and expert statements on this subject, spanning a total of 273 exhibits.  The Court held a hearing concerning the motion to decertify on April 17, 2015.

In all, a representative sample constituting 88 of the approximately 900 opt-in Plaintiffs have been deposed.  To ensure this sample was thereby representative, counsel for each side picked half of the deponents from the total field of opt-ins.  (Discovery Order at 6, Dkt. No. 123).[1]  In addition to the opt-in Plaintiffs, Dave Hurlock, HSG's senior vice president, and John Kelly, a divisional vice president, were also deposed.

## BACKGROUND

Defendant Healthcare Services Group is a publicly traded corporation whose nationwide business is the overall management of housekeeping departments in nursing homes and similar facilities.  (John Kelly Depo. 178:20–179:13, 236:2–17, Mot. Ex. 115).  To oversee its business

---

[1] In the Court's original Discovery Order, each side was allowed to choose 50 opt-in Plaintiffs to depose. Varying factors resulted in a number of those depositions being cancelled, and it appears that only 88 or so depositions were taken.

HSG employs a common hierarchical corporate structure: a president, vice presidents, divisional vice presidents, regional managers, and district managers.  (*Id.* 226:13–228:3).  HSG divides the United States into nine districts, which are each overseen by a divisional vice president.  (*Id.*)  Those nine divisions are subdivided into sixty-five regions that are overseen by the regional managers.  (*Id.*)  The sixty-five regions are further subdivided into four hundred total districts, which are each headed by a district manager.  (*Id.*)  Each district has an average of eight to twelve facilities, or "accounts," located within its bounds.  (*Id.*)  Each facility has an "account manager" that works at the facility.[2]  (*Id.*)  These salaried account managers are the employees at issue in the conditional class.

The facilities in question are not owned or operated by HSG but, instead, are owned and operated by independent third parties.  In most instances, HSG's business is to supply labor, primarily in the form of a cleaning staff, to the facilities.[3]  (*Id.* 34:2–35:10).  In most facilities, HSG hires housekeepers, light laundry workers, heavy laundry workers, and sometimes floor specialists to keep each facility clean.  In facilities where HSG supplies the labor, it is undisputed that HSG's account managers also provide labor to help keep the facilities clean.  (*See* Account Manager Job Description at 3, Dkt. No. 250-6 (listing manual labor tasks as "Essential Functions of the Job")).

It is undisputed that there are two different types of account managers: "exempt" (salaried) or "non-exempt" (hourly).  The exempt or nonexempt status of an account manager is

---

[2] There are two types of account managers that work at HSG-managed facilities.  The first type of account manager is the salaried account manager, who is paid a fixed salary no matter how many hours the manager works.  The second type of account is the hourly account manager, who is paid an hourly wage.  The hourly account managers are non-exempt employees but the salaried account managers are exempt employees.  This Order only considers the class of salaried account managers, as the class of hourly account managers will be addressed in a future Order.

[3] HSG also supplies other services to some of the facilities, such as dietary services.  Those services are not at issue in this case.

not determined based on the individual account manager's actual day-to-day duties.  It is also not based on the amount of manual labor performed by the individual account manager.  Instead, as Dave Hurlock, senior vice president of HSG stated, the exempt or non-exempt status of an account manager is based on "the dollars available to perform the management functions" at each facility, which is determined when the third party owner of a facility contracts directly with HSG.  (Hurlock Depo. 87:7–15, Resp. Ex. 51).

Each facility has a "labor budget" or "payroll budget" that is determined at the time the facility contracts with HSG.  (*Id.* 47:17–19).  This budget determines the number of hours that hourly workers are scheduled to work.  Eighty cents of every dollar spent at HSG goes to pay for labor.  (John Kelly Depo. 99:10–12, Mot. Ex. 115 & Resp. Ex. 53).  Therefore, in the words of HSG's 30(b)(6) witnesses, "the payroll budgets are especially important."  (*Id.* 97:16–18).

Plaintiffs point to an overarching theme that unites their contentions:  All salaried account managers are required "to complete the remaining work" at a facility (Resp. at 2), which requires the account managers "to perform the job assignments of the Light Housekeeper, Heavy Housekeeper and Laundry Worker," (Account Manager Job Description at 3).  According to the Plaintiffs, this saves money for HSG because the salaried account manager is a fixed cost, while the hourly laborers (e.g., housekeepers) are variable costs.  By using a fixed cost source instead of a variable cost source to supply extra hours of manual labor, a facility can stay within the established labor budget for that facility even if extra labor hours are needed.  Since controlling payroll—HSG's biggest cost—is HSG's primary objective, HSG requires that the district managers (who oversee the account managers) keep "all facilities under budgeted hours every month."  (District Manager General Goals/Responsibilities at 1, Resp. Ex. 6).  John Kelly,

HSG's 30(b)(6) witnesses, confirms this mentality: "The correct number for overtime is zero." (John Kelly Depo. 100:18–22, Resp. Ex. 53).

Believing that account managers were wrongly classified as "exempt" employees because of the extent of the manual labor they perform, the named Plaintiffs filed this lawsuit. The question for the Court at this stage is whether the case can properly proceed as a class action.

## LEGAL STANDARD

Under the FLSA, employees who bring suit may do so individually or as a collective action on behalf of "themselves and other employees similarly situated."  29 U.S.C. § 216(b). FLSA collective actions operate on an "opt-in" basis in which potential class members must give affirmative notice of their consent to join the suit.  *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1212 (5th Cir. 1995), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003).  One stated purpose of the collective action is to allow plaintiffs "the advantage of lower individual costs to vindicate rights by the pooling of resources." *Hoffman–La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989).

The Fifth Circuit "has never set a legal standard for collective-action certification." *Roussell v. Brinker Intern., Inc.*, 441 F. App'x 222, 226 (5th Cir. 2011) (unpublished) (citing *Mooney*, 54 F.3d at 1216).  However, this Court, like many others within this circuit, follow the two-step certification process for collective actions set forth in *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987).  *See, e.g.*, *Mooney*, 54 F.3d at 1213–14; *see also Lipnicki v. Meritage Homes Corp.*, 2014 WL 5620603, at *2 (S.D. Tex. Nov. 4, 2014) (Costa, J.); *Clark v. Centene Co. of Tex., L.P.*, 44 F. Supp. 3d 674 (W.D. Tex. 2014) (Sparks, J.).  The first step, known as conditional certification, results in notice being provided to potential plaintiffs who can then choose to opt in.  *Mooney*, 54 F.3d 1213–14.  The standard for this initial notification phase is

fairly loose, as it is "usually based only on the pleadings and any affidavits which have been submitted." *Mooney*, 54 F.3d at 1213; *Lipnicki*, 2014 WL 5620603, at *2.

After the opt-in period and discovery, defendants often move for decertification.  This second step results in a more rigorous determination of whether the plaintiffs are similarly situated such that the action should be tried collectively.  *Mooney*, 54 F.3d at 1214.  To determine whether there is sufficient similarity, courts consider three relevant factors: "(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations."  *Roussell v. Brinker Int'l, Inc.*, 441 F. App'x 222, 226 (5th Cir. 2011) (unpublished) (quoting *Mooney*, 54 F.3d at 1213 n.7); *Lipnicki*, 2014 WL 5620603, at *2.

These factors touch on the ultimate question, which is "whether the named plaintiffs are substantially similar to the opt-in plaintiffs."  *Clark v. Centene Co of Tex., L.P.*, 44 F. Supp. 2d 674, 688 (W.D. Tex. 2014) (Sparks, J.).  As Judge Costa has pointed out, however, the "first and second certification factors—the disparate factual and employment settings of the individual plaintiffs and the various individualized defenses available to the defendants—[] largely merge into one inquiry because the disparate factual and employment settings are relevant to whether the common" defenses can be tried collectively.  *Lipnicki v. Meritage Homes Corp.*, 2014 WL 5620603, at *2 (S.D. Tex. Nov. 4, 2014) (Costa, J.).  Thus, there is substantial overlap between factors (1) and (2).

## ANALYSIS

HSG claims that the opt-in Plaintiffs are not similarly situated because disparate factual and employment settings are present.  In other words, HSG asserts that the Plaintiffs have no "glue" to hold their claims together.  HSG says the testimony of the opt-in Plaintiffs is not

uniform and that HSG's expert report shows too much variability between the opt-in Plaintiffs

day-to-day duties.  Plaintiffs respond that a collective trial is appropriate because there is not

substantial variation in how the Plaintiffs perform their job duties, that they are all subject to the

same decision to treat the salaried account managers as exempt, and that there is a common,

uniform job description that applies to all Plaintiffs.

### 1.  Disparate Factual and Employment Settings

Under this factor, the Court looks to whether the Plaintiffs "perform similar duties" by

looking to what occurred "on the ground" at the actual facilities.  *Lipnicki v. Meritage Homes*

*Corp.*, 2014 WL 5620603, at *3, 5 (S.D. Tex. Nov. 4, 2014) (Costa, J.).  As our sister courts in

this state have made clear, the decision to uniformly classify all employees as exempt is not, by

itself, a sufficient justification to proceed as a class action.  *Id.* at *3.  The "key," however, is a

finding that the "employees performed their jobs pursuant to the employers' prescribed duties or

in an otherwise uniform way."  *Id.* at *3; *see also Morgan v. Family Dollar Stores, Inc.*, 551 F.3d

1265, 1264 (11th Cir. 2008) ("There is nothing unfair about litigating a single corporate

decision . . . where there is robust evidence that store managers perform uniform, cookie-cutter

tasks mandated by a one-size-fits-all corporate manual.").

### a.  The Presence of a Uniform Job Description

As an initial matter, HSG argues that the law implies that "[a] simple job description

alone provides no common glue to Plaintiffs' individualized claims and HSG's defenses at this

stage."  (Mot. at 6).  HSG cites to 29 C.F.R. § 541.2 to support its argument.  (*Id.*)  Notably, 29

C.F.R. § 541.2 does not reference a job description.  Instead that regulation states, "A job title

alone is insufficient to establish the exempt status of an employee."  29 C.F.R. § 541.2.  The

Defendant knows and understands the difference between a corporate job *description* and a job *title*.

The presence of a universal, corporate job description distinguishes this case from the case relied on by HSG and provides a common glue to the opt-in Plaintiff's claims.  In *Reyes v. Texas EZPawn*, relied on by HSG, the plaintiffs sought to certify the class-action status of all assistant store managers that worked in EZPawn shops around the State of Texas.  2007 WL 101808, at *1 (S.D. Tex. 2007).  Instead of relying on a common job description, the plaintiffs sought to prove their similarly situated status through testimony of their actual day-to-day job duties.  *Id.* at *2.  The court looked to the plaintiffs' testimony for such a showing.  *Id.*  Finding that showing inadequate, the court found that the testimony itself did not establish that plaintiffs in each shop performed similar job duties on a day-to-day basis.  *Id.*  *Reyes* is clearly distinguishable from the present case.

Conversely, other district courts in Texas have noted the role that a job description and uniform job requirements play in the similarly situated analysis.  In *Lipnicki v. Meritage Homes Corp.*, Judge Costa compared the plaintiffs' testimony to the defendant's "prescribed job duties."  *See* 2014 WL 5620603, at *1, 3 (S.D. Tex. Nov. 4, 2014) (noting the existence of a "job description" and comparing the "[p]laintiffs' testimony about their day-to-day routines" with defendant's "prescribed job duties that resulted in the classification.").  These "prescribed job duties" were gleaned from a common "job description" and "training."  *See id.* at *3 (quoting the divisional president of the company who said, "Meritage's sales people are trained and expected to regularly and customarily engage in a nonexhaustive list of outside sales activities . . . .").  After a detailed comparison of sample testimony from the plaintiffs, the *Meritage Homes* court found that the plaintiffs' testimony of their day-to-day activities was "inconsistent with [the

defendant's] prescribed job duties."  *Id.* at *3.  In other words, "[p]laintiffs' testimony regarding what actually occurred 'on the ground' varie[d] significantly," and therefore, the court was convinced that these "disparities" meant the plaintiffs were not similarly situated.  *Id.* at *5.

The most compelling example of a job description which acted as "glue" for a set of plaintiffs' allegations comes from the Eleventh Circuit's affirmance of a district court's decision to not decertify the class of assistant store managers that worked at Family Dollar Stores. *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1262 (11th Cir. 2008).  According to the Eleventh Circuit, "Family Dollar has the same job description for all [plaintiffs]." *Id.* at 1249. This job description outlined "cookie-cutter tasks mandated by a one-size-fits-all corporate manual."  *Id.* at 1264.  The Eleventh Circuit outlined the extensive nature of the plaintiffs' prescribed job duties from this manual, which included how the "tiniest of details are governed," for example, who had to turn off the coffee pot and how the clipboards in the office should be hung.  *Id.* at 1248–50.  The court noted that the defendant's "corporate office issues [these] instruction manuals with operating policies that apply uniformly to all stores nationwide."  *Id.* at 1248.  Finding "robust evidence that store managers" perform these "uniform, cookie-cutter tasks," the Court concluded that "[t]here is nothing unfair about litigating [the] single corporate decision [to apply a blanket exemption] in a single collective action."[4]  *Id.* at 1264.

In the present case, the opt-in Plaintiffs rely on a company-wide job description and uniform "standardized" job routines for HSG's account managers.  (Job Routines, Resp. Ex. 29); (Account Manager Job Description, Dkt. No. 250-6).  In the job description, HSG spells out the various duties that a person holding the position of "account manager" is required to perform. This description includes certain managerial duties, such as "[k]now the unit, inspect it

---

[4] The Court notes that the *Morgan* court was examining factor two when making these statements, but as stated earlier, there is substantial overlap between the two factors.  The presence of a uniform job description is relevant to both.

frequently," and "inspect employee work daily," among many others.  (Account Manager Job

Description at 1).  However, it also includes what are obviously non-managerial, labor intensive

duties, including the instruction that "the Account Manager must be able to perform the job

assignments of the Light Housekeeper, Heavy Housekeeper and Laundry Worker." (*Id.* at 3).  In

addition, the description lists requirements of the job, including "the ability to lift 20 to 30 pound

bags of soiled linen to the washer for loading a minimum of 40 times a day," "the ability to lift

10 to 15 pound buckets of water from the floor to the sink a minimum of 15 times a day," "the

ability to bend and sort soiled linen a minimum of 2 hours a day," "the ability to bend at the

knees, waist and neck at least 50 times a day . . . ," and "the ability to push a 50 pound trash or

linen hamper safely in and out of elevators and down hallways." (*Id.* at 3).

        In addition to the formal corporate job description for the position of "account manager,"

HSG uses standardized job routines to rigorously outline how the cleaning itself is done in each

facility.  "The[se] are standardized routines that never vary, e.g., the 5 and 7 step [cleaning]

method will always be how a patient room is cleaned." (District Manager Development Program

Manual at 3, Resp. Ex. 48).  This sentiment was echoed by HSG's 30(b)(6) witnesses John

Kelly: "[T]he policies and procedures to complete the cleaning [in the facilities] should be the

same [across the country]." (John Kelly Depo. 176:11–15, Mot. Ex. 115 & Resp. Ex. 53).  These

routines outline uniform, cookie-cutter tasks, and the district managers are instructed to "NEVER

adjust a routine to fit an employee." (District Manager Development Program Manual at 3).

Furthermore, "[c]hanges in the routine should never be done at the account [manager] level

without district manager approval." (*Id.*)  In other words, the account manager has no discretion

to change how he or she "performs the job assignments of the Light Housekeeper, Heavy

Housekeeper and Laundry Worker," and has no discretion to change how those workers do their

jobs either.  (Account Manager Job Description at 3).  Finally, "[c]ompletion of the daily

routines is the #1 responsibility of every Account Manager." (Job Routines at 1, Resp. Ex. 29).

This uniform job description together with these precise job routines are pieces of

evidence that suggest uniformity and define the potential scope of the opt-in Plaintiffs' job

duties.  However, the "key to the 'similarly situated' finding . . . is that the employees perform[]

their jobs pursuant to" these "prescribed job duties" or "in an otherwise uniform way."  *Lipnicki*

*v. Meritage Homes Corp.*, 2014 WL 5620603, at *3 (S.D. Tex. Nov. 4, 2014) (Costa, J.).

Accordingly, the Court now looks to the testimony of the exemplary opt-in account managers to

compare what occurred "on the ground" at each facility and to see if it matches the above-

described job requirements, duties, and routines.

### b.  Testimonial Uniformity

The law is clear that the plaintiffs in these types of class actions need only to be

"similarly situated," not "identically situated."  *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d

1233, 1243 (11th Cir. 2008).  In fact, most courts acknowledge that there will be "numerous

differences" and "legitimate differences" in the plaintiffs' testimony.  *Clark v. Centene Co. of

Tex., L.P.*, 44 F. Supp. 3d 674, 688 (W.D. Tex. 2014) (Sparks, J.).  The question for the court,

however, is whether these differences are "so material as to prevent [Plaintiffs] from being

similarly situated to one another."  *Id.*; *see also Morgan*, 551 F.3d at 1261 (looking for "legally

significant differences").

A roadmap for the following discussion will be helpful:  First the Court addresses the

deposition evidence provided by the Plaintiffs, which leads to findings of fact on certain issues.

Next, the Court addresses HSG's arguments in response and addresses specific examples cited

by HSG.  Finally, the Court will point to specific examples of testimony that support the Court's

conclusion that what occurred "on the ground" matches HSG's prescribed duties for the account manager position.

To show that the opt-in Plaintiffs are similarly situated, the Plaintiffs point to deposition testimony showing that the events which occurred on the ground are substantially the same from account manager to account manager.  The Court has reviewed the extensive testimony cited by the Plaintiffs.  The Court agrees with Plaintiffs that the evidence shows that account managers spend the vast majority of their workday performing manual labor.  (*See* Resp. at 5 & n.39 (pointing to the deposition testimony of 86 opt-in Plaintiffs)); *see also infra* Appendix.  This fact is consistent across the different regions.  (Resp. at 10 & n.48–50).  The Court finds that the primary reasons that this occurs is because the account managers work the routines of hourly employees, cover for staff, and are required to complete a number of special projects to keep the facilities clean.  (Resp. at 10 & n.50–53).[5]  As a matter of fact, the account managers are expected to perform some managerial functions, but the overwhelming weight of the testimony shows that the account managers spend their time cleaning, not managing.  (Resp. at 9–11 & n.45, 48–54).  Also, when compared to their hourly employees, the per hour salary of the account managers was similar. (Resp. at 14 & n.62).  Furthermore, to the extent they do "manage," almost all decisions potentially attributable to an account manager, especially those relating to

[5] In addition to HSG's 30(b)(6) witness John Kelly, the Plaintiff presented over 37 accounts of opt-in Plaintiffs echoing this fact.  Kelly agreed that "Healthcare Services expect[s] account managers to perform manual labor."  (John Kelly Depo. 188:14–17).  Moreover, he also agreed that the company expects account managers to fill out the positions of housekeepers and laundry workers, just as prescribed in the Account Manager Job Description.  *Id.* 188:18–189:17.  This evidence constitutes a substantial showing of similarity across the entire Plaintiff class.

specific acts, such as hiring, firing, promoting, scheduling, and budgeting, are all made by the district manager.[6]

HSG attempts to highlight certain differences between the actual events that occurred on the ground at each facility by pointing to differences in the opt-in Plaintiffs' testimony.  A common theme to HSG's citations, however, is that they tend to not tell the whole story.  The opening citations of HSG's motion present a good example.  There, HSG believed it had found two contradictory statements to present to the Court.  (Mot. at 2).  On the one hand is the testimony of opt-in Plaintiff John Stevens, who HSG alleges "regularly performed numerous managerial tasks, including hiring, firing, interviewing, managing supplies, disciplining, retraining," etc.  (Mot. at 2).  "On the other hand," alleges HSG, is the testimony of "another Plaintiff[—Kendrah Hollanquest—who] claimed manual labor comprised all of her workday— 'every day'—for around ninety hours a week."  (Mot. at 2).  While HSG would have the Court believe that the testimony of these two opt-in Plaintiffs is so different in nature that class certification is impossible, the Court's review of the testimony reveals otherwise.  The Court has extensively reviewed the testimony of John Stevens and disagrees with HSG's characterization of Stevens' testimony.  For example, HSG alleges that Stevens "regularly performed numerous managerial tasks, including . . . promoting."  (Mot. at 2).  When the Court looked to the portion of the testimony cited by HSG, it became apparent that Stevens was only asked whether he had ever *recommended* anyone for a promotion.  He replied, "Once."  (Stevens Depo. 139:14, Mot. Ex. 103 & Resp. Ex. 50).  "Once" is not "regularly," and recommending an employee for a promotion is not the same as promoting an employee.  HSG alleges that Stevens "regularly performed numerous managerial tasks, including . . . quality control inspections."  (Mot. at 2).

---

[6] To support this notion, the Plaintiff has cited numerous depositions that the Court has considered.  The Court, in general, agrees with the Plaintiffs' characterization of these depositions.  (Resp. at 3 & n.15); (*id.* at 4 & n.19–23); (*id.* at 5 & n.35–37); (*id.* at 14 & n.59).

When asked how often he did quality control inspections, Stevens said "very rarely."  (Stevens Depo. 79:21–23).  He did not have the time.  (*Id.*)  HSG alleges that Stevens "regularly . . . ensur[ed] employees stayed on task."  (Mot. at 2).  When asked whether he was able to keep "an eye on the staff, the hourly employees, on a day-to-day basis," Stevens bluntly said, "No," he "[d]idn't have time."  (Stevens Depo. 140:13–18).  HSG alleges that Stevens "regularly performed numerous managerial tasks, including . . . managing supplies."  (Mot. at 2).  When asked about managing supplies, Stevens said he would "do it real quick because you didn't have a whole lot of time to spend dealing with that stuff."  (Stevens Depo. 78:9–11).  When asked about ordering inventory, Stevens said he would "do inventory every month, try to anyway." (Stevens Depo. 77:1–25).  These examples do not show that Stevens regularly engaged in what HSG claims; they show just the contrary.  In fact, the only "regular" task Stevens testified to was manual labor, saying that he spent "[a]t least 90 percent of" his day, every day, performing manual labor.  (Sevens Depo. 143:4–7).

As a comparator to Stevens, HSG highlights the testimony of Kendrah Hollanquest. However, while the Court notes that there are some differences in the employees' combined 500 pages of testimony, the Court finds that none of the differences are "so material as to prevent [these two Plaintiffs] from being similarly situated to one another."  *Clark v. Centene Co. of Tex., L.P.*, 44 F. Supp. 3d 674, 688 (W.D. Tex. 2014) (Sparks, J.).  The Court finds that the differences between Stevens' and Hollanquest's testimony is not factual but results principally from HSG's differing characterizations.  For example, HSG alleges that Hollanquest "did not supervise employees."  (Mot. at 2).  Just like John Stevens, however, Hollanquest said, "I wasn't managing [the employees] because I was cleaning."  (Hollanquest Depo. 180:21–22, Mot. Ex. 71 & Resp. Ex. 102).  Next, HSG alleges that Hollanquest did not order supplies.  (Mot at 2).  Yet,

14

Hollanquest said that she would call her district manager and say "hey, we need this, hey, we need that" when supplies were running out.  (Hollanquest Depo. at 119:7–8).  In substance, Hollanquest's testimony sounds much like Stevens' testimony.  Stevens said he did inventory once a month, or tried to anyway.  (Stevens Depo. 77:1–25).  When asked about quality control inspections, Hollanquest testified that she knew she was supposed to do them but "didn't have time to do them" because she was cleaning.  (Hollanquest Depo. 198:6–25).  In substance, this echoes Stevens' testimony, who knew he was supposed to do quality control inspections but "very rarely" did them because he didn't have time.  (Sevens Depo. 79:1–25).  HSG alleges that Stevens hired new applicants and that Hollanquest did not.  (Mot. at 2).  However, the testimony reveals—despite HSG's assertion to the contrary—that it was the district manager who hired new applicants in both cases, not the account managers.  (Hollanquest Depo. 194:7–11); (Stevens Depo. 45:10).[7]  Much of the same applies to the areas of discipline and firing:  It was the district managers who made these decisions, not the account managers.[8]  Hollanquest also testified that she never promoted an employee, much like Stevens who testified he had only once

---

[7] Stevens testified that he would "start paperwork on [the applicant] which would have to go to the district manager for approval."  (Stevens Depo. 45:9–10).  He then said that "sometimes [the district manager] would just say no [to hiring the applicant] for whatever reason.  They wouldn't give you a reason."  (Stevens Depo. 47:24–25).  Under the second factor, HSG alleges the exemption defense.  Relevant to that defense is whether the employees "suggestions and recommendations as to the hiring . . . of other employees are given particular weight."  29 C.F.R. § 541.100(a)(4).  Although Stevens testified that the district manager hired most of the applicants he "start[ed] the paperwork on," the fact that the district manager would also routinely reject that paperwork and not give any reasons for their rejections greatly diminishes the "particular weight" given to Stevens' recommendations.  This leads the Court to find no material difference between Stevens' testimony and those of other account managers like Hollanquest.  It is noteworthy that, HSG explained none of this surrounding context when making the assertion that Stevens regularly engaged in management tasks like hiring while Hollanquest did not.

[8] Despite HSG's assertion to the contrary, it was the district manager that had to approve all firing and disciplining decisions.  (Stevens Depo. 50:8–9).

recommended an employee for a promotion.[9]  (Hollanquest Depo. 197:1–3); (Stevens Depo.

139:14).  The Court's review of these two opt-in Plaintiff's testimony—whose alleged

differences represent the most powerful example HSG muster—reveals, in fact, vast swaths of

uniformity with only minimal, immaterial differences.  The most striking similarity with respect

to the character of both employees' jobs as a whole, however, is the fact that both employees'

primary job was to the clean the facility while only secondarily dealing with tangential

management issues.

    The fact that opt-in Plaintiffs spent the majority of their days doing manual labor is a

common similarity that runs through all of the opt-in Plaintiff's testimony.  While the amount of

time spent doing manual labor is not dispositive of the exemption issue under the second factor[10]

or the resolution of the employment settings factor, similarity of the facts "on the ground" (and

whether these facts match the prescribed job duties and requirements) is what the Court looks to

in conducting the similarity situated analysis.  Having sorted through the thousands of pages of

testimony, the Court finds that the overwhelming evidence shows substantial similarity in the

---

[9] Under the second factor, HSG alleges the exemption defense.  Relevant to that defense is whether the employees "suggestions and recommendations as to the . . . promotion or any other change of status of other employees are given particular weight."  29 C.F.R. § 541.100(a)(4).  On this subject, Stevens was also asked, "Did you ever recommend anyone for a raise?"  He said he did for "certain people, but nobody ever got one."  (Stevens Depo. 139:21–25).  In other words, the fact that Stevens did recommend one person for a promotion may have slight relevance to the second factor, but the surrounding deposition testimony shows much more context.  As noted above, these types of one-time events are not so material that they preclude collective resolution of the ultimate issues of this case.

[10] The Code of Federal Regulations states that "[t]o qualify for exemption under this part, an employee's 'primary duty' must be the performance of exempt work."  29 C.F.R. § 541.700(a).  The regulations then go on to define "primary duty" as the "principal, main, major or most important duty that the employee performs."  *Id.*  To help the fact finder (in this case, the jury) assess this, the regulations state that one factor is "the amount of time spent performing exempt work."  *Id.*  Notably, the entire next subsection of the regulations is dedicated to how the "amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee." *Id.* § 541.700(b).  Thus, a showing of similarity concerning the amount of time spent doing exempt work versus manual labor is highly probative.  *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1269–70 (11th Cir. 2008).

character and extent of the employees' jobs as a whole, which matches the account managers'

prescribed non-managerial job duties.

From the Court's review of the testimony, the Court finds that all opt-in Plaintiffs who

testified on the topic[11] spent the overwhelming majority of their time doing manual labor that

was prescribed by HSG's job duties for an account manager.  For example, account manager

Ulus Hunt spent 75%–80% of his day doing manual labor that included "stripping and waxing

two rooms a day, on top of buffing an entire four hallways and nursing station, and taking out the

trash, making sure the ground w[as], you know, swept" and more.  (Hunt Depo. 92:11–93:19;

147:25–148:02, Resp. Ex. 60).

Similarly, Joe Ann Calvin spent up to 80% of her day "do[ing] laundry," "do[ing] floor

tech on the weekend that [she] was supposed to be off in order to strip and wax floors[,] and

do[ing] housekeeping," very much in line with the duties outlined in the account manager job

description.  (Calvin Depo. 127:25–128:08, Resp. Ex. 61).  Mellissa Benford testified that

"[a]bout 80 percent of the time [she] performed manual labor."  (Benford Depo. 161:12–13,

Resp. Ex. 62).

Allen Griffin testified that he spent 90% of his day doing manual labor, which meant he

would have to "get the dirty linen," "carry the trash out," "put the trash cans back," "buff[] the

floors," "do the room change," "move all the [] dining tables and everything," "strip the floor,"

"take a wet vac and vacuum up the excess stripper," "take a mop and mop it over four times."

(Griffin Depo. 206:11–14; 206:17; 206:19; 208:1–2; 208:6–7; 208:12–14, Resp. Ex. 64).

These tasks, of course, require the abilities outlined in the job description, including the

ability to "lift 20 to 30 pound bags of soiled linen to the washer," "to lift 10 to 15 pound buckets

---

[11] Some opt-in Plaintiffs were either not asked the question or their testimony on this question was not
presented to the Court.  However, HSG provides no opt-in Plaintiff's testimony that contradicts this
assertion.

of water," "to bend and sort soiled linen," "to bend at the knees, waist and neck at least 50 times a day," and "the ability to push a 50 pound trash" hamper, among other things.  (Account Manager Job Description at 3).

As further examples, account manager Nicole Moore testified to spending "[b]etween 80 to 90 percent" of her day cleaning.  (Moore Depo. 206:12–19, Resp. Ex. 55).  Similarly, account manager Sarah Johnson spent 85% of her day doing manual labor.  (Johnson Depo. 74:1–4, Resp. Ex. 56).  Nathan Adcock spent 95% of his day doing the same.  (Adcock Depo. 168:13–17, Resp. Ex. 57).  Similarly, account manager Craig Corbin spent 70%–80% of his day doing manual labor.  (Corbin Depo. 41:8–10, Resp. Ex. 58).  Jason Cloer spent "about 85 percent" of his day doing manual labor because he had to "clean, clean soiled utility rooms, strip[] and wax a patient's room, change rooms. . . . [and] Dust[] the vents."  (Cloer Depo. 116:19–21; 156:2, Resp. Ex. 65).  Craig Owen tells the same story, spending "75–80 percent of the day" doing "floor care, vacuuming, dusting, windows, buffing, waxing, put[ting] away supplies, anything that needed to be done on a daily basis."  (Owen Depo. 185:14–186:1, Resp. Ex. 66).

Account manager Miyuki Wofford testified that she was "always on the floor," which is slang for saying that she was working "on the floor as a floor tech," or "on the floor as a housekeeper," just as prescribed in the account manager job description.  (Wofford Depo. 221:1–8, Resp. Ex. 67).  According to her testimony, these tasks meant she "might be pulling trash. [She] might be buffing.  [She] might be pulling some linen, [she] might be doing a linen check," *id.*, just as prescribed in the account manager job description.  According to her, this resulted in manual labor for 90% of her day.  (*Id.* 255:3).  Ruthanne Carroll said she also spent 90% of her time doing manual labor as an account manager.  (Carroll Depo. 219:1, Resp. Ex. 69).

Account manager Justina Hart spent 85%–90% of her day cleaning and doing floors. (Hart Depo. 162:6–11, Resp. Ex. 83).  Similarly, account manager Scott Gash stated that he spent "most of the time" doing manual labor and his routine consisted of "Mondays, helping floor techs; Tuesdays, housekeeping; Wednesday, floor tech; Thursdays housekeeping; Fridays, floor tech, and weekends it alternated." (Gash Depo. 129:4–7, 231:7–9, Resp. Ex. 84)  This schedule, again, falls directly in line with the prescribed job duties set forth in HSG's uniform job description for account managers.

The above list is representative.  The 88 opt-in Plaintiff's depositions that the Court reviewed all consistently tell the same story.[12]  While the Plaintiff pointed to each opt-in Plaintiff's deposition to support their position on this point, the Defendant did not provide a single citation to an opt-in Plaintiff whose testimony was different on this point.  In other words: while the list goes on, the story remains the same.

It is important for the Court to note that it draws no ultimate conclusions as to the underlying merits of the case based on the above fact findings.  However, the Court is persuaded that a distinct similarly exists between these opt-in Plaintiffs.  Their testimony as to what they consistently do on a day-to-day basis matches what HSG requires them to do vis-à-vis its uniform job description.  This type of showing is evidence of clear uniformity.  The Plaintiffs' testimony shows that all the opt-in Plaintiffs routinely spend the majority of their days doing manual labor as prescribed by HSG within the job duties and requirements of an account manager.  The Court expressly finds that the weight of this evidence is overwhelming.

c.   **"Person-specific factors" and "facility-specific factors"**

---

[12] The Court attaches as an appendix a summary of the amount of time each deposed opt-in Plaintiff said he or she routinely spent doing manual labor.

HSG alleges that "person-specific factors" and "facility-specific factors" mean that each account manager's job experience was different, precluding collective action in this case.   In other words, HSG alleges that variations in particular Plaintiffs day-to-day activities or variations between facilities bar the Plaintiffs from collective action.   Plaintiffs respond that the decision to exempt all account managers from overtime pay without regard to any person-specific or facility-specific factors means HSG did not consider them relevant then, and they should not be dispositive now during the similarly-situated analysis.   The Court not only agrees with the Plaintiffs, but also finds very little evidence that person-specific or facility-specific factors caused account managers to have differing experiences depending on where they worked or who they worked under.

### i.   *Person-specific factors*

First, HSG claims that the case cannot be adjudicated on a class-wide basis because "each [regional manager] and, to an extent, each [district manager] has independent discretion to set policies and priorities within their regions and districts."   (Mot. at 3).   HSG implies that these "person specific" factors mean that account managers perform their job differently depending on who they work under.   (*Id.* at 9).   As addressed both above and in the attached appendix, the testimony about what happens *on the ground* does not support this contention.   It is inconsistent, in the extreme, for HSG to argue this distinction when it exempted all account managers from overtime pay requirements without regard to region, district, or hiring and firing authority.   While the fact that HSG did not perceive such a distinction is not alone sufficient to justify certification, it is probative of the issue.   *See Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1263 (11th Cir. 2008) ("[E]ven Family Dollar perceived no such distinction.   Indeed,

it exempted all store managers from overtime pay requirements without regard to . . . region, district, or hiring and firing authority.").

Despite this, HSG cites to the testimony of John Kelly—HSG's 30(b)(6) corporate representative and a divisional vice president at the company—to suggest that these "person specific factors" should be dispositive.  As noted, the divisional vice president oversees multiple regional managers, who in turn oversee multiple district managers, who in turn oversee the account managers at issue.

HSG overstates the implications of John Kelly's testimony.  HSG asserts that the testimony of John Kelly suggests that each regional manager and each district manager have independent discretion to set policies and priorities within their regions and districts.  After looking to the evidence which HSG cites to support this proposition, the Court reaches the opposite conclusion.  For example, when asked, "Do the regional managers have discretion to implement what they believe are best practices within their own respective divisions . . . ?," John Kelly responded, "It varies by topic, but the regional managers function independently running their regions.  It can result in certain variability as it relates to format of documents . . . and monthly reporting, et cetera."  (John Kelly Depo. 228:9–19, Mot. Ex. 115).  The Court does not find that the regional manager's discretion over the "format of documents" or "monthly reporting" substantively affects the day-to-day "variability" of the account managers who work two rungs below them.  In fact, it suggests just the opposite.  It shows a rigid structure within the organization that does not create variability or discretion to a legally significant degree from region to region or facility to facility based on the person-specific factors.  If the best example of regional manager discretion that HSG can present is that some of the forms used to report data

may vary, then there is not a real variance or any discretion from region to region. Certainly not such that would defeat class certification.

With respect to district managers, John Kelly was asked whether district managers "have the freedom [to] manage their districts in a way that varies from other districts." (John Kelly Depo. 228:20–23). He responded, "In certain cases the district managers have the autonomy to do basic functions differently. There could be, for example, different agendas at a district meeting. [T]hey could have different topics that they view as priorities." (*Id.* 229:1–7). Once again, the freedom to do "basic functions" differently or have "different agendas" at a meeting does not suggest that these managers have any real degree of independent discretion that results in legally significant variability for those working below them. Based on the testimony, the Court finds that the district managers and the account managers working below them lack discretion to change the standardized jobs they are given. When coupled with the fact that John Kelly also testified that "the policies and procedures to complete the cleaning [in the facilities] should be the same" all over the country, (*id.* 176:11–15), the weight of his testimony does not convince the Court that the district managers or regional managers have such a degree of independent discretion that it would affect how account managers perform their jobs from facility-to-facility, from region-to-region, or from day-to-day.

Additionally, the opt-in Plaintiffs' testimony supports this conclusion. A number of account managers worked in more than one facility and under more than one district manager. The overwhelming weight of the testimony of account managers who worked across facilities and/or district managers shows that their job duties did not vary from facility-to-facility or manager-to-manager. For example, Lori Rousey worked as an account manager at multiple facilities and under multiple district managers. She testified that regardless of the facility or

manager, she performed 90%–95% manual labor with very little managerial responsibilities. (Rousey Depo. 305:2–5, Resp. Ex. 72 (90% manual labor at Springfield facility); 305:12–24 (95% manual labor at Kindred facility); 306:4–6 (90% manual labor at Cambridge facility under two different district managers); 306:11–14 (95% manual labor at Hillcreek facility under two different district managers); 306:20–21 (90% manual labor at Kindred Bashford facility); 307:1–4 (90% manual labor at Mt. Holly facility)).  As another example, Tina Thibault worked as an account manager in multiple facilities and worked under multiple district managers.  When asked whether her "experience doing 80 to 90 percent manual labor [was] the same at each facility that [she] was an account manager," she responded "[y]es." (Thibault Depo. 267:8–13, Resp. Ex. 74). The same is true for opt-in Plaintiff Mickel Smith, (Smith Depo. 154:1–7, Resp. Ex. 75), and for opt-in Plaintiff Jeri Young, who worked at multiple facilities under multiple district managers, (Young Depo. 171:3–15, Resp. Ex. 87), for Kevin McNeely, (McNeely Depo. 123:15–17, 220:13–20, Resp. Ex. 107), and others.

HSG alleges other differences in the account manager's testimony, arguing that "variation is manifest in duties highly relevant to the assessment of each [account manager's] proper classification . . . ."  (Mot at 8–9).  As in previous examples, HSG's conclusory characterizations do not reflect the reality born out by the record.  The Court's own analysis of the testimony cited by HSG reveals that HSG has relied principally on over-characterizations and unsupported conclusory statements.  The Court finds that the opt-in Plaintiffs' testimony shows no material or legally significant differences on any of the issues raised.

For example, the fact that "[s]ome [account managers] worked under only one [district manager] during the relevant time period, [while] others more than six," (mot. at 9), is not legally significant unless the account managers' work was fundamentally different under the different

23

managers.  As just shown by the testimony of Lori Rousey and many others, it was not.  As

another example, the fact that "some [account managers] spoke to their [regional managers]

regularly, [while] others never met the [regional manager] or knew his or her name," (mot. at 9),

is not legally relevant or material unless it led to different relevant effects "on the ground."  As

noted previously, the testimony of opt-in Plaintiffs across the country shows very little variation

concerning the overall character of their job.

To give another concrete example of mischaracterization, HSG claims that "[e]ach

[district manager] exercised differing levels of supervisory control over [account managers],

saying that some [district managers] allegedly micromanaged a facility by directly supervising it

for three to five days a week, eight hours a day, and limiting [account manager] responsibilities."

(Mot. at 9).  When the Court examines the testimony cited as support, however, this

characterization falls down.  In the deposition offered to support this contention by HSG, counsel

asked account manager Nathan Adcock "[h]ow often would [the district manager] check on

you?"  He replied, "Well, not often.  I mean, he would walk by if I was stripping and waxing a

room to see if, you know, I was putting wax on correctly."  (Adcock Depo. 84:6–7, Mot. Ex. 41).

Adcock also testified that the district manager, on average, was not at the facility four out of

seven days per week.  (*Id.* 83:14–20).  When asked if, on those days the district manager was not

present, the district manager would require Adcock to communicate with him, Adcock said, "No.

I would be cleaning the room or stripping and waxing the floor."  (Adcock Depo. 85:17–20).

This testimony is hardly a showing of "micromanaging."  (Mot. at 9).  In fact, when

summarizing his responsibilities, account manager Adcock's testimony sounds of a familiar tone:

"I was just a body in that building . . . to strip and wax and keep the rooms clean."  (Adcock

Depo. 140:2–4).

24

With regard to these "person specific factors," the Court is convinced that the overwhelming weight of the evidence shows they are virtually non-existent.  As the above examples indicate, the Court is persuaded that HSG presented portions of testimony out of context, re-characterized them to fit their arguments, and then cited them to the Court in support of their positions.[13]  When each opt-in Plaintiff deposed produced over 250 pages of deposition testimony, it is hardly surprising that HSG could find some differences to point out.  However, the Court finds, to the limited extent that they do exist, that none of them are so material as to prevent the Plaintiffs from being similarly situated.

ii.  *Facility-specific factors*

As to facility-specific factors, HSG next argues that the facilities themselves varied to such a degree that there is no uniformity.  HSG argues that this case presents a strong argument for decertification because "there are over 900 opt-ins that worked in forty-five states and over 1,000 unique facilities with housekeeping departments large (twenty employees) and small (three to four employees)."  (Mot. at 8).  In other words, HSG argues that because the account managers work in so many different places they must *a priori* be so different that a similarly

---

[13] The Court pauses to note that HSG's oversimplification, over-characterization, and cherry-picking of the actual testimony given are common themes.  Given the thousands of pages of deposition testimony, it is not surprising that each side has plenty of fodder for comparisons.  However, time and time again, HSG makes a broad, sweeping conclusion and cites to testimony, which upon substantive analysis, is most often out of context and does not support its claim.

In HSG's motion, in the "factual background" section, HSG makes sweeping pronouncements about how different the Plaintiffs' testimony is purported to be.  The Court reviewed all the underlying testimony and is forced to disagree with HSG's characterizations.  To take but one example of many, Defendant cited to ten lines of testimony of account manager Padraig Mcauley for the proposition that she was involved in firing employees.  (Mot. at 5 & n.44).  However, upon the Court's review, the Court found that in the next five lines Mcauley backtracked, saying, "Well, I can't terminate an employee without approval from my district manager.  And usually what will happen is the district manager will come in and review their file and any write-ups or whatever and then make the decision whether or not to terminate them."  (Mcauley Depo. 138:25–139:5, Mot. Ex. 81).  It is precisely this type of cherry-picking of testimony that makes HSG's positions *appear* defensible on their face, but it also causes their ultimate conclusions to fall apart upon closer inspection.  Such actions ultimately force the Court to lose faith in HSG's credibility on these critical issues.

situated finding is foreclosed.  The Court, however, is not convinced that HSG's facility-specific distinctions are relevant to the similarly situated analysis.  As noted previously, courts are only concerned about these facility-specific factors when, for example, "the duties of [managers] varied significantly *depending* on the store's size, sales volume, region, and district."  *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1263 (11th Cir. 2008) (emphasis added).  In *Morgan*, the court explicitly rejected the type of argument made here—which is especially enlightening considering that the *Morgan* district court certified a class of over 1,400 individuals at thousands of different stores.  That court rejected the argument because it found "scant evidence" that these factors caused variation in the job duties performed.  *Id.*

Upon a similar review of the record, this Court likewise finds scant evidence to support the contention that "diverse settings" cause legally relevant variation in the account managers' day-to-day duties.  As just one example, HSG argues that the presence or absence of a "floor tech" at a facility would change "the amount of floor care performed by the [account manager] . . . ."  (Mot. at 13).  HSG cites to the testimony of Royce Stevens to support its proposition.  (Royce Stevens Depo. 125:23–126:3, Mot. Ex. 102).  What HSG does not mention, however, is that the presence of the floor tech had no effect on how much labor Stevens performed, only the type of labor.  In fact, Royce Stevens *still* testified to spending "80 to 90 percent" of the time "mopping, scrubbing the floors, and doing other manual labor," despite the existence of a floor tech.  (Royce Stevens Depo. 166:4–7, Resp. Ex. 79).  The evidence shows that Royce Stevens spent time "mopping" and "scrubbing" while opt-in Plaintiff Adcock (discussed earlier) spent time "stripping" and "waxing," but as courts have stated, some difference in the specific task the Plaintiff is doing is only relevant if the difference is "material and preclude[s] collective resolution of [a] case."  *Clark v. Centene Co. of Tex., L.P.*, 44 F. Supp.

3d 674, 688 (W.D. Tex. 2014) (Sparks, J.); *see also Morgan v. Family Dollar Stores, Inc.*, 551

F.3d 1233, 1261 (11th Cir. 2008) (considering the "legally significant differences" between opt-

in plaintiffs).  This Court expressly finds that the evidence shows the facility-specific factors

present no difference that approaches the requisite "material" (or "legally significant") standard

that would "preclude collective resolution of this case."  *Clark*, 44 F. Supp. 3d at 688; *Morgan*,

551 F.3d at 1261.

### d.  Relevance of non-opt-in Plaintiffs

HSG provides declarations and an expert report based on information gathered from

current HSG employees that served as account managers that did not opt-into this lawsuit (non-

opt-in account managers).  The opt-in Plaintiffs argue that the information gathered from the

non-opt-in account managers is irrelevant to the similarly situated analysis.

"[T]he ultimate issue is whether the named plaintiffs are substantially similar to the opt-

in plaintiffs."  *Clark v. Centene Co. of Tex., L.P.*, 44 F. Supp. 3d 674, 688 (W.D. Tex. 2014)

(Sparks, J.); *see also Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1260 (11th Cir. 2008)

("A court's determination that the evidence shows *a particular group of opt-in plaintiffs* are

similarly situated is a finding of fact."  (emphasis added)).  One court, however, has also found

that non-opt-in employees who hold the same job title as opt-in plaintiffs may provide relevant

testimony.[14] *Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 570 n.2 (E.D. La 2008).  In a

similar vein, this Court finds that the information provided by the non-opt-in account managers

is not entirely irrelevant.[15]  However, the Court also finds that the weight of the evidence

---

[14] Albeit, the only citation provided by the Defendants is to a footnote in one district court case, which is cited hereafter.

[15] The Court does, however, have concerns (discussed below), such as comparability, regarding the applicability and reliability of survey evidence from non-opt-in employees as to the claims of the opt-in employees.

provided by the non-opt-in account managers does not begin to outweigh the overwhelming amount of evidence, and the clear showing of uniformity, provided by the opt-in Plaintiffs.

The Court addresses the expert report provided by Dr. Cristina Banks (Banks Report), but the reasoning discussed herein is equally applicable to the attorney-drafted declarations signed by only non-opt-in account managers and HSG employees.  Banks "conducted a job analysis study in which [she] collected job information from 297 Account managers working in 11 states."  (Banks Report ¶ 2, Mot. Ex. 116).  "People who were contacted and participated in this job analysis study were *HSG employees* that held the title of Account Manager and that *did not opt into the class*."  (*Id.* ¶ 2 n.1) (emphasis added).  Banks found that  the "[r]esults of the study show that on an individual basis Account Managers vary widely in the tasks they performed and in the amount of time spent on different groups of tasks (called Task Areas) which comprise the job." (*Id.* ¶ 3).  She further concluded that "[o]nly 11 of the 248 Account Managers[16] reported spending more than half of their time performing non-exempt work."  (*Id.* ¶ 4).

There are multiple reasons why the Banks Report does not offset the testimony of the opt-in Plaintiffs.  First, as the Court noted earlier, "the ultimate issue is whether the named plaintiffs are substantially similar to the opt-in plaintiffs."  *Clark v. Centene Co. of Tex., L.P.*, 44 F. Supp. 3d 674, 688 (W.D. Tex. 2014) (Sparks, J.).  The fact that the Banks Report only relies on the testimony of non-opt-in account managers leads the Court to give it less weight in the similarly situated analysis.  On the one hand, the Court has pored through thousands of pages of testimony from nearly 90 opt-in Plaintiffs and found they all tell a very similar story; while on

---

[16]  Banks notes that 481 Account Managers were invited to participate and 315 sat for the survey.  *Id.* ¶ 33.  Of those 315 who sat, 297 completed the survey.  *Id.* ¶ 40 n.16.  Eight of those 297 were excluded because they had not been on the job for 3 months.  *Id.*  Twenty-three of the new subset were eliminated because they responded "careless[ly]." *Id.* ¶ 40.  Another 18 then apparently were eliminated due to "math errors or missing responses." *Id.* ¶ 45 n.17.  This results in 248 responses.  In other words, about 51% of the non-opt-in account managers who were invited to participate produced responses that actually ended up in the Banks study.

the other hand, the Banks Report is presented with statistical summaries gathered from a series of carefully worded survey questions given to non-opt-in account managers and current HSG employees.  While HSG points to a footnote in *Johnson v. Big Lots Stores* for the proposition that the Court should make no distinction between the non-opt-in account managers' and the opt-in Plaintiffs' evidence, (Reply at 5 n.15, Dkt. No. 250), the *Johnson* court's analysis focused extensively on the survey results of *opt-in* plaintiffs.  *Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 570 (E.D. La. 2008) ("The [expert survey] consisted of seven categories of questions, and it was mailed to *all 936 opt-in* plaintiffs."  (emphasis added)); *id.* at 578 ("Instead of buttressing the earlier showing of similarity among *opt-in* plaintiffs . . . , the evidence of *opt-in* plaintiffs job experiences presented at trial . . . reveals substantial variations among the *opt-in* plaintiffs." (emphasis added));  *id.* ("At a high level of generality *opt-in* plaintiffs' job duties . . . ."  (emphasis added)); *id.* at 579 ("But in terms of individual job duties, the evidence shows that the *opt-in* plaintiffs have different responsibilities . . . ."  (emphasis added)); *id.* ("The diverse response of *opt-in* plaintiffs . . ." (emphasis added)).  Furthermore, as the Plaintiffs rebuttal expert points out, "[i]t would be reasonable to assume that many of these [non-opt-in] Account Managers have a more positive view of their jobs than that held by the average employee in their position."  (Moss Report at 6, Resp. Ex. 140).  This conclusion is especially reasonable in light of the fact that participation in the Banks survey was apparently voluntary, given to current HSG employees, and required up to an hour-and-a-half drive to the test administration site.  (Banks Report ¶ 31).

Second, the Court finds that the Banks Report's purported variability is based on differences that are not "so material as to prevent [Plaintiffs] from being similarly situated to one another."  *Clark v. Centene Co. of Tex., L.P.*, 44 F. Supp. 3d 674, 688 (W.D. Tex. 2014) (Sparks,

J.).  The law is clear that the plaintiffs in these types of class actions need only to be "similarly

situated," not "identically situated."  *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1243

(11th Cir. 2008).  Yet, the Banks Report alleges variability based on, for example, 42 distinct

laundry tasks,[17] (Banks Report, "Tasks List" Appendix at 4), or 48 housekeeping and floor

tasks,[18] (*id.* at 3).  The Court agrees with the Plaintiff's rebuttal expert, who stated that "in terms

of measuring the common structure of the position relative to labor standards criteria, all such

tasks would be combined as manual labor or cleaning."  (Moss Report at 7); *see also Morgan v.*

*Family Dollar Stores, Inc.*, 551 F.3d 1233, 1249 (11th Cir. 2008) (making no distinction between

the *type* of manual labor tasks, and instead stating that "[t]he overwhelming evidence showed

that Plaintiff store managers exercise little discretion and spend 80 to 90% of their time

performing manual labor tasks, such as stocking shelves, running the cash register, unloading

trucks, and cleaning the parking lots, floors, and bathrooms.").  In other words, much of the

alleged "variability" in the non-opt-in account managers' answers is, in fact, just re-

characterizations of manual labor.  The Court finds that this so-called "variability" is not so

material as to prevent the non-opt-in account managers, much less the opt-in Plaintiffs, from

being similarly situated to one another regarding the claims asserted in this case.

---

[17] For example, "collect soiled linen," "collect and transport laundry to soiled linen room (e.g., using cart)," "put on personal protective equipment to sort, load and unload washers and dryers," "weigh the soiled linen to avoid machine overload," "sort soiled linen to be washed," "sort personal clothing to be washed," "load soiled linen into washing machines," "wash soiled linen in washing machine," and many more.  (Banks Report, "Tasks List" Appendix at 4).  The Court finds that the difference between these tasks is not material.  *See Clark*, 44 F. Supp. 3d at 688.

[18] For example, "sweep and dust-mop the floors of the facility," "sweep the entryways or walkways outside the facility," "fill water bucket and mop," "burnish/buff the floors," "strip and wax floors," "scrub tile floors," "conduct low-dusting," "conduct high-dusting," "sweep, mop and dust stairwells," and many more. (Banks Report, "Tasks List" Appendix at 3).  The Court does not find the difference between these tasks to be material.

Third, the Banks Report makes its own conclusions about what activities count as "managerial" or "exempt."  For example, the Banks Report asserts that "controlling inventory" counts as an exempt task, while "processing inventory" counts as a non-exempt task.  (Banks Report tbl.4)  In the same vein, the Banks Report calls "overseeing equipment needs" an exempt task while "fixing and maintaining equipment" is non-exempt.  (*Id.*)  Similarly, when the non-opt-in account managers were asked why they were performing specific manual labor tasks, the Banks Report would classify certain activities as "exempt" based on arbitrary analysis of the rationale given for performing the task.  (*Id.* ¶ 54)  For example, one account manager may be stripping and waxing a floor "to promote good relations with the client"—which the Banks Report concludes is a managerial reason and therefore exempt in nature—or stripping and waxing the floor to "complete an unfinished task"—which the Banks Report concludes is a non-managerial reason and non-exempt in nature.  (*Id.*  tbl.7)  However, "completing unfinished tasks" clearly "promotes good relations with the client," so the Court strains to see the distinctions drawn.

For at least these reasons, the survey questions and declarations from the non-opt-in account managers do not outweigh the significant evidence of uniformity presented by the opt-in Plaintiffs' testimony.

## 2.  Individualized Defenses

The Court will not revisit the substantial amount of evidence already presented that is also relevant to this factor.  To the extent that evidence relevant to "disparate factual and employment settings" is also relevant to individualized defenses, the Court notes that the Plaintiffs have presented evidence showing substantial similarity.  Here, the Court will look to

additional evidence supporting a finding of substantial similarity under the individualized defenses factor.

In its motion, HSG focuses its argument under this factor on (1) its exemption defenses, and (2) the credibility of certain opt-in Plaintiffs evidenced by statements made during depositions.  (Mot. at 14–16).

First, HSG asserts the application of the executive and administrative defense.  (Mot. at 14).  "Section 13(a)(1) of the Fair Labor Standards Act, as amended, provides an exemption from the Act's minimum wage and overtime requirements for any employee employed in a bona fide executive, administrative, or professional capacity."  29 C.F.R. § 541.0(a).  "The section 13(a)(1) exemptions and the regulations . . . do not apply to manual laborers or other 'blue collar' workers who perform work involving repetitive operations with their hands, physical skill and energy."  29 C.F.R. § 541.3(a).

Under the executive exemption test, the jury must determine whether four factors are met.  29 C.F.R. § 541.100.  Of these four factors, numbers two, three, and four are at issue, which means the jury must determine whether the opt-in Plaintiffs are employees "(2) [w]hose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof; (3) [w]ho customarily and regularly directs the work of two or more other employees; and (4) [w]ho has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight."  29 C.F.R. 541.100(a).

Under the administrative exemption test, the jury must determine whether three factors are met.  29 C.F.R. § 541.200(a).  Of these three factors, numbers two and three are in dispute,

which means the jury must determine whether the opt-in Plaintiffs are employees "(2) [w]hose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (3) [w]hose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200(a).

At this stage, the Court does not need to determine the answer to the exemption question but, instead, needs to determine whether it would be fair to HSG to try its individualized defenses using representative opt-in Plaintiff testimony.  Based on the weight of the evidence, the Court finds that the Plaintiffs are similarly situated such that treatment as a class would not prejudice the Defendants.

The exemption defenses are "the most fact-intensive" part of the lawsuit.  *Clark v. Centene Co. of Tex., L.P.*, 44 F. Supp. 3d 674, 689 (W.D. Tex. 2014).  The Court has already addressed many facts relevant to HSG's exemption defenses.  The Court has examined thousands of pages of testimony and has found that the account managers were assigned management related duties (in accordance with HSG's prescribed job description), but the account managers uniformly testify that they had little time to perform these duties and it took up a minimal (usually very minimal) part of their work days.

The Court also has found that these account managers had an overall lack of discretion. Every major decision and change had to be approved by the district manager working above them.  This was clear company policy.  HSG's policy is explained in its own uniform corporate document directing all district managers: "Account Managers must not be allowed to change Job Routines without permission.  90% of the time their changes result in compromise, inefficiencies, and more money spent."  As a result, "[c]hanges in routines should never be done

33

at the account level without the approval of the [district manager]." (District Manager

Development Program Manual at 3, Resp. Ex. 48).

Further, HSG's own expert acknowledged that the exemption defenses can be adjudicated

collectively.  In her March 17, 2014 Supplemental Expert Report, she specifically focuses on

exempt work, and states, "In sum, *despite variability on time spent on individual tasks* from

Account Manager to Account Manager, I conclude that, on the whole, Account Managers'

primary purpose is to manage facility operations and housekeeping staff, and they spend the

majority of their time performing exempt work." (Supplemental Banks Report ¶ 14, Resp. Ex.

144 (emphasis added)).  In other words, HSG's expert argues that *every Plaintiff's* "primary

duty" finding can be determined *regardless of individual differences. See Clark v. Centene Co.

of Tex., L.P.*, 44 F. Supp. 3d 674, 690 (2014) ("[Defendants] argued *every Plaintiff* is exempt

*regardless of individual differences*."  (emphasis in original)).  At trial, the ultimate fact finder is,

of course, free to agree or disagree with Banks' assessment of that primary duty finding.  At this

stage, however, the Court agrees that the primary duty finding and overall exempt status can be

determined collectively regardless of the individual differences.

Second, with regard to the credibility "issues" of certain opt-in Plaintiffs, HSG claims

that a few statements made during the hundreds of hours of depositions warrant decertification of

the entire class.  (Mot. at 15).  According to HSG, these statements require "individualized

inquiries of all opt-ins," and would require an "inevitable mini-trial[]" for each Plaintiff.  (Mot.

at 15).  The Court disagrees.

HSG claims that one Plaintiff testified "to never writing certain reports, only to backtrack

moments later when presented with documentary evidence," and as a result, there are "serious

credibility issues." (Mot. at 15).  The Court carefully reviewed this cited testimony.  Opt-in

Plaintiff James Cloer testified that he had never written down a monthly report. (Cloer Depo. 70:5–6, Mot. Ex. 55). After a confusing exchange with HSG's lawyers, Cloer appears to admit that in the first month he was with the company, a person named Jessie helped him type a monthly report into an email to show Cloer how to do a monthly report. (Cloer Depo. 69:19–73:25, 78:1–80:25, Mot. Ex. 55). This appears to be the only monthly report that HSG alleges Cloer ever did, yet HSG claims that this email is "documentary evidence" showing that Cloer lied about writing down a monthly report. (Mot. at 15). This situation does not raise "serious credibility issues" that prevent the certification of a class action.[19]

HSG claims that another small subset of account managers "made representations in their resumes or to prospective employers regarding their job duties as [account managers]" but had to "recant when the description did not align with the other testimony." (Mot. at 15). The Court again reviewed the cited testimony. The Court finds that the account managers' resumes that they sent to other companies show them wanting to highlight the "managerial" aspects of the account manager position while wanting to de-emphasize the manual labor aspects of their position at HSG. When applying for other jobs, the reasons for this choice are obvious to the Court. However, when pressed under oath at the deposition these account managers uniformly testified that the majority of their work at HSG was manual labor. While this may reveal these individuals "human nature," the Court does not perceive this type of issue as a "serious credibility issue" that prevents the certification of a class action.

---

[19] HSG also claims that "some Plaintiffs testified they had significant exempt duties, but either failed or refused to exercise those duties." (Mot. at 16). This contention is equally unsupported by their cited testimony except to the extent already found by the Court; namely, that the opt-in Plaintiffs testified that they did not have time to do managerial tasks because they were too busy cleaning.

HSG also claims that the fact that two account managers had felony convictions prevents certification of the entire class.  (Mot. at 15–16).  HSG does not provide the Court with any law to support such an assertion, and the Court finds none.

Finally, HSG claims that three account managers declared bankruptcy but did not list the HSG claim on their bankruptcy proceeding.  (Mot. at 15).   As evidenced by HSG's motion for summary judgment on this issue, it is possible to handle these types of outliers collectively without decertifying the class.

In sum, the credibility issues are minimal and inadequate to prevent class treatment of these common claims.

### 3.  Procedural Considerations and Fairness

"A collective action affords plaintiffs "the advantage of lower individual costs to vindicate rights by the pooling of resources.  The judicial system benefits by efficient resolution in one proceeding of common issues of law and fact." *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989).  However, "[p]roceeding collectively always poses certain logistical challenges . . . .  But the alternative—more than two dozen individual trials litigating largely the same liability issues and defenses—is less efficient, less expedient, and simply unnecessary." *Clark v. Centene Co. of Tex., L.P.*, 44 F. Supp. 3d 674, 691 (W.D. Tex. 2014) (Sparks, J.).

This Court agrees with the reasoning proffered by Judge Sparks.  As previously found, the jury can aptly determine the liability issues and defenses on a collective basis.  The alternative—more than nine hundred trials litigating largely the same liability issues and defenses—is less efficient, less expedient, and simply unnecessary.

HSG also argues that because "[m]ost Plaintiffs have no records of the amount of time they worked," "tremendous complications would arise if damages ever have to be calculated in

this case." (Mot. at 17). HSG's unilateral decision to apply a blanket exemption and then not have salaried account managers clock in and out of work each day is the only reason such records do not exist. To allow HSG to now use that absence to form the basis for denying an otherwise proper class action would be unjust in the extreme. If allowed, such a perverse scenario would create far-reaching and highly negative incentives for all employers in the future. *See Frye v. Baptist Mem'l Hosp., Inc.*, 495 F. App'x 669, 672 (6th Cir. 2012) ("[C]ourts relax plaintiffs' burden to show damages under the FLSA if the employer fails to keep accurate records, allowing plaintiffs to rely on an 'inferential damage estimate.'").

Additionally, Plaintiffs have presented a triable plan to calculate damages. Based on records that HSG did keep, Plaintiffs have created a spreadsheet that would calculate damages based on certain jury findings. In addition, many of the Plaintiffs testified under oath at their deposition as to how many hours they worked, on average, each week. In light of this, there is no reason to require 900 separate trials on liability.

## CONCLUSION

For the reasons set forth above, HSG's Motion to Decertify the Salaried Class of Account Managers is **DENIED**. Although the Court now denies HSG's Motion in light of the nearly seven thousand pages of evidence already submitted and reviewed by the Court, the Court notes that it is "charged with the duty of monitoring its class decisions in light of the evidentiary development of the case." *Richardson v. Byrd*, 709 F.2d 1016, 1019 (5th Cir. 1983). For this reason, and notwithstanding this instant denial, the Court reserves the ongoing right to decertify the class after trial has taken place. *See Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 570 (E.D. La. 2008) (decertifying class after trial).

**So ORDERED and SIGNED this 15th day of May, 2015.**

_____
RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE

**Appendix Concerning Percentange of Time Spent on Manual Labor**

| Ex. | Account Manager Name | Percent of Time on Manual Labor |
|---|---|---|
| 50 | Stevens, John | 90% |
| 54 | Hackman, John | all but one hour a week |
| 55 | Moore, Nicole | 80-90% |
| 56 | Johnson Rochon, Sarah | 85% |
| 57 | Adcock, Nathan | 95% |
| 58 | Corbin, Craig | 70-80% |
| 59 | Barger, James | 65-75 hr/wk |
| 60 | Hunt, Ulus | 75-80% |
| 61 | Calvin, Joe Ann | 60-80% |
| 62 | Benford, Melissa | 80% |
| 63 | Baez, Jorge | N/A |
| 64 | Griffin, Allen | 90% |
| 65 | Cloer, Jason | 85% |
| 66 | Owen, Craig | 75-80% |
| 67 | Wofford, Miyuki | 90% |
| 68 | Newton, Dennis | 70-80% |
| 69 | Carroll, Ruthanne | 90% |
| 70 | Dominguez, Andrian | 90% |
| 71 | Underwood, James | 90-95% |
| 72 | Harrell, Lori | 90-95% |
| 73 | Cleveland, DeCarlos | over 90% |
| 74 | Thibault, Tina | 80-90% |
| 75 | Smith, Mickel | 70% |
| 76 | Hixon, Sandra | 95% |
| 77 | Layne, Jason D. | 90% |
| 78 | Bowman, Marshall | 80-90% |
| 79 | Stephens, Royce | 80-90% |
| 80 | Jamison, Corey D | "the whole day" |
| 81 | Fox, Matthew | 90% |
| 82 | Clark, Betty | 80-90% |
| 83 | Hart, Justina | 85-90% |
| 84 | Gash, Scott | "most of the time" |
| 85 | Calarruda, Jane | 90% |
| 86 | Heard, Robin | 80% |
| 87 | Young, Jeri | 95-98% |
| 88 | Waltman, Janice | 90% |
| 89 | Patino, Sylvia | 80% |
| 90 | Diaz, Virginia | 90-95% |
| 91 | Packard, Allen | 75-80% |
| 92 | Hardee, Victoria | 80% |
| 93 | McBride, Timothy | 90% |
| 94 | Terry, Chelsa | "a lot of my time" |

**Appendix Concerning Percentange of Time Spent on Manual Labor**

| Ex. | Account Manager Name | Percent of Time on Manual Labor |
|---|---|---|
| 95 | Wesson, Bonita | 98% |
| 96 | Hicks, Rhonda | 90% |
| 97 | Talbot-Hruska, Theresa | 90% |
| 98 | Kirk, John | 97% |
| 99 | Brown, Rosie | "doing a manual job just like the houskeeper" |
| 100 | Wilson, Lorenzo | N/A |
| 101 | Trevino, Joe | N/A |
| 102 | Hollanquest, Kendra R | 100% |
| 103 | Wajer, Aaron | 75-80% |
| 104 | McLean, Ian | N/A |
| 105 | Beegle, Jordan | he did "all the manual labor" |
| 106 | Wimer, Kenneth | 75-80% |
| 107 | McNeely, Kevin | 80-85% |
| 108 | Wilhelm, Susan | 70-80% |
| 109 | Baez, Manuel | 85-90% |
| 110 | Bowers, Lisa | 80-85% |
| 111 | Ramos, Miguel | 80-90% |
| 112 | Conway, Mel | 90% |
| 113 | Smith, Sarah Leann | 95% |
| 114 | Nunez, Lucha M | 90% |
| 115 | Harris, Lynn M | 90% |
| 116 | Stewart, Valerie | 75-80% |
| 117 | Lopez, Alexis | "all the time" |
| 118 | Kreck, Stephen C | 90% |
| 119 | Fleming, Raymond L | 95% |
| 120 | Phebus, Ryan | 80-85% |
| 121 | Cockrell, Karim A | 90% |
| 122 | Patton-Coke, Jenece | 80-90% |
| 123 | Rivera, Luis | 60-80% |
| 124 | Clark, Darrell | "all through the day" |
| 125 | Cortijo-Rivera, Samuel | N/A |
| 126 | Hanna, Walter | 80-90% |
| 127 | Hilburn, Roy Lynn | N/A |
| 128 | Johnson, Charles | 80% |
| 129 | Johnson, Tonia L. | 5-6 hr/day |
| 130 | Kern, Catherine | 95% |
| 131 | McAuley, Padraig | 80% |
| 132 | Modrak, Fina | 80-90% |
| 133 | Monaco, Mario | 75% |
| 135 | Peak, Charles | 80% |
| 136 | Pope, Tatiana | N/A |
| 137 | Smith, Daniel Albert | 80-85% |

**Appendix Concerning Percentange of Time Spent on Manual Labor**

| Ex. | Account Manager Name | Percent of Time on Manual Labor |
|-----|---------------------|--------------------------------|
| 138 | Williams, Melissa | 80% |
| 139 | Brooks, Edward | 90% |